## THE STATE v. ALBERT ELLIS, Appellant.

Division Two, June 8, 1922.

1. **CONFESSION: Coerced by Police.** A young woman had been murdered, on a vacant lot near her home, soon after she alighted from a street car at 8:30 on Thursday evening, November 4th. She and defendant had previously been sweethearts, but the engagement had been broken, and about a week prior to the homicide, as they talked together on the same vacant lot, she was heard to angrily refuse to renew it. He had loitered about the scene for two hours before she left the car, and on Friday he was arrested, but after being questioned at the police station was released. Shortly before eleven o'clock on Saturday he was re-arrested and taken in a patrol wagon to the police station, where he was interrogated by the police almost continuously until about daylight Sunday morning. During the inquisition, carried on by relays of police and continued over eighteen hours, he was given no food and was not permitted to sleep. One police officer, who was a large man, slapped him, because he said the accused was disrespectful, and another because he called the officer a liar. His shoes were taken from him; at one time he was stripped of his clothing; he was required to look at two bright reflectors, so that the light fell on his face, and was forbidden to turn his face away to rest his eyes; he was taken to his cell for a few minutes at a time and then brought back for further interrogation; he was compelled, on Saturday afternoon, and again before daylight on Sunday morning, to go with police officers to the vacant lot where the girl was murdered, and then while it was yet night to go to the undertaker's, and there stand before her body and to place his hand on the corpse, while the light was flashed on her face; and thereafter, about seven o'clock Sunday morning, he agreed to confess, and a confession was written out, giving the details of the homicide, and signed by him and witnessed by several persons. *Held*, that the confession was not voluntary, and its admission in evidence was reversible error.

2. ———: ———: **Admissibility Relegated to Jury.** It is proper for the trial court, apart from the jury, as a preliminary step, to hear the evidence upon the question whether the confession by defendant was voluntary, where it is challenged as involuntary, and, where there is a sharp conflict in the testimony, to relegate the whole question to the jury for its determination under proper in-

structions. But the question cannot be referred to the jury where the defendant testifies only in such preliminary inquiry, and makes out a case of a confession coerced by extreme abuse and scourging by the police; for in such case, the defendant not having testified before the jury and having made an extreme presentation of coercion in his testimony before the court, the question of the admissibility of the confession becomes one of law for the court to decide.

3. ————: ————: **Police: Abuse of Accused.** The conduct of police officers in needlessly laying abusive hands on a helpless man while being detained without warrant deserves the severest censure.

4. ————: ————: **Subsequent Voluntary Confession: Continuing Coercive Influence.** Where the written confession is involuntary, because coerced and extorted by the abuse of the accused by police officers, the burden is on the State to show that such influences were no longer dominant when he made subsequent oral confessions, and until it is shown by the State that such influences had been removed and were no longer dominant any subsequent oral incriminating statements made by him while still in the custody of said officers are presumed to have been the product of the same influences and to have been coerced by intimidation and fear.

Appeal from St. Louis City Circuit Court.— *Hon. Moses Hartmann*, Judge.

REVERSED AND REMANDED.

*William Maffitt Bates* for appellant.

(1)    The trial court erred in admitting the confessions in evidence. The confessions were false and were improperly secured from defendant by officers while he was in their custody. They were the result of the use by said officers upon defendant of coercive means and methods which were inhuman, unlawful and criminal in their nature. Acts 22:22-29; 1 Cooley's Blackstone, chap. 1, star p. 133; State v. Thomas, 250 Mo. 212; Bram v. United States, 168 U. S. 542; Com. v. McClanahan, 153 Ky. 417, 50 L. R. A. (N. S.) 1077, note. (a) St. Louis policemen are officers of the State. R. S.

1919, sec. 8973; State ex rel. v. Comm., 184 Mo. 133. They are not empowered or authorized to initiate criminal proceedings, or to examine and punish prisoners. When they undertake to do so they are assuming functions which are entrusted solely to the courts without those precautions which courts are required by law to use. R. S. 1919, secs. 8953, 8954, 8963; Regina v. Mick, 3 F. & F. 822. (b) No cases require more careful scrutiny than those of disclosure made by a party under arrest to an officer who has him in custody. Bram v. United States, 168 U. S. 542; People v. Knapp, 42 Mich. 270; Preuit v. People, 5 Neb. 383; Com. v. Curtis, 97 Mass. 578; United States v. Martin, 26 Fed. 1182; State v. Cross, 72 Conn. 722; 2 Moore on Facts, 1173, 1174, 1328; Regina v. Stokes, 70 Jurist, 192; State v. Barrington, 198 Mo. 125. (c) The age, size, schooling, experience and mental capacity of the defendant, together with all the circumstances under which the confessions were made, are to be taken into consideration in determining the question of their admissibility. State v. Fredericks, 85 Mo. 149; State v. Powell, 258 Mo. 248; State v. Nave, 283 Mo. 39. (d) Policemen, witnesses for the State, according to their own admissions, were guilty of violating the criminal statute against oppression and abuse of authority. R. S. 1919, secs. 3193, 3195; State v. Ragsdale, 59 Mo. App. 590; 3 Bouvier's Law Dictionary (8 Ed.) "Oppression," "Oppressor." (e) The testimony of witnesses for the State shows that policemen, in obtaining the confessions of defendant, violated every clause of the criminal statute concerning third-degree methods. R. S. 1919, secs. 3681, 3682. (f) Policemen, witnesses for the State, without warrant held defendant in "hold-overs" and in custody for a period of seventy hours without opportunity to consult with counsel and other persons in his behalf, in violation of the statute. R. S. 1919, sec. 3200. (2) The first or original confession was extorted from the defendant by policemen who, for eighteen hours, applied to defendant third-degree methods, including beating, starving, depriving

of sleep and continuous questioning and holding out hopes of bail and release. Said confession was not free and voluntary, as clearly shown by the facts testified to by the State's witnesses. The court erred in admitting it on the unjustified conclusions of those who extorted it. State v. Wooly, 215 Mo. 682; State v. Powell, 266 Mo. 107; State v. Thomas, 250 Mo. 211; State v. Lewis, 273 Mo. 525; People v. Loper, 159 Cal. 6. (a) As one means to compel defendant to confess, police officers, as commanded by their captain, took him to the presence of the corpse of the murdered girl, and required him to stand within a few inches of it for five or ten minutes (and, as defendant says, compelled him to touch the corpse), thus bringing forth from the rubbish of the Dark Ages, the Ordeal of Bier, a superstition having no ground either in law or reason. Case of Murder in Hertfordshire, 14 Howell's State Trials, 1324, 1328; Trial of Philip Stansfield, 11 Howell's State Trials, 1380. (3) Where a confession has been obtained through influence, a presumption arises that a subsequent confession flows from a like influence, and such presumption must be overcome before the confession can be given in evidence. State v. Jones, 54 Mo. 478; State v. Brown, 73 Mo. 631; State v. Wood, 122 La. 1014; State v. Lee, 127 La. 1077; Johnson v. State, 48 Tex. Crim. 423; Banks v. State, 93 Miss. 700; Reason v. State, 94 Miss. 290; People v. Loper, 159 Cal. 6; 16 C. J. 722-723. (4) If a man be accused, interrogated and browbeaten by those who have him in custody until his will is overcome by mental torture, his confession thus obtained is no less involuntary than when obtained by physical punishment. State v. Powell, 258 Mo. 249; State v. Thomas, 250 Mo. 211; State v. Lewis, 273 Mo. 525; Com. v. McClanahan, 153 Ky, 416; People v. Quann Gim Gow, 138 Pac. (Cal.) 919; State v. Fields, Peck (Tenn.) 140; Wilson v. State, 110 Ala. 1; 2 Hawk, P. C. (6 Ed.) 604: (5) The confessions admitted in evidence were involuntary as a matter of law, and the court erred

in admitting them in evidence.  State v. Powell, 258 Mo. 248, 250, 266 Mo. 107; State v. Thomas, 250 Mo. 211; State v. Lewis, 273 Mo. 518; Bram v. United States, 168 U. S. 547; Purpura v. United States, 262 Fed. 473; Ammons v. State, 80 Miss. 592; Com. v. McClanahan, 153 Ky. 417; Robertson v. State, 81 Tex. Crim. 378; Gallaher v. State, 40 Tex. Crim. 311.

*Jesse W. Barrett,* Attorney-General, and *R. W. Otto,* Assistant Attorney-General, for respondent.

(1)  The confession and statements made by the defendant in the presence of police officers, newspaper reporters and disinterested witnesses were freely and voluntarily made and were properly admitted in evidence.  (a)  A confession is prima facie presumed to be voluntary unless the contrary is shown.  State v. Patterson, 73 Mo. 705; State v. Myers, 99 Mo. 119; State v. Jones, 171 Mo. 406; State v. Woodward, 182 Mo. 411; State v. Armstrong, 203 Mo. 559.  (b)  Where the evidence on the question of voluntariness is conflicting, or where the court is in doubt whether the confession was or was not voluntary, the whole matter may be left to the jury under instructions to disregard the confession unless they find that it was voluntarily made. State v. Moore, 160 Mo. 460; State v. Jones, 171 Mo. 407; State v. Stebbens, 188 Mo. 398; State v. Brooks, 220 Mo. 84; State v. Roach, 215 N. Y. 598; State v. Lipsczinska, 180 N. W. 622; People v. Prestidge, 182 Mich. 80; State v. Foster, 136 Iowa, 527; Pigott v. Engle, 60 Mich. 227, 27 N. W. 539; State v. Storms, 113 Iowa, 385, 85 N. W. 610.  (c)  The jury upon proper instructions found that there were no threats or promises made nor was the appellant forced to make a confession.  The question was one for the jury and their finding is conclusive.  State v. Brooks, 220 Mo. 74; State v. Spaugh, 200 Mo. 571; State v. Hedgepeth, 125 Mo. 14; State v. Patterson, 73 Mo. 695; State v. Lee, 231 S. W. 619; State v. Roach, 215 N. Y. 598; People v. Lipsczinska,

294 Mo.—18

180 N. W. 622. (2) A confession of guilt is not ren-
dered involuntary and inadmissible because made in re-
sponse to interrogatories propounded by an officer, nor
because the interrogatories assume the guilt of defend-
ant, nor because such officer pretends to have evidence
of defendant's guilt when he has no such evidence, nor
if cunning artifice, falsehood and deception are used.
State v. Thomas, 250 Mo. 211; State v. Barrington, 198
Mo. 109; State v. Phelps, 74 Mo. 136; State v. Jones, 54
Mo. 478; State v. Wooley, 215 Mo. 683. (a) The fact that
the confession was made to an officer or in the presence
of an officer after the defendant had been arrested is
not sufficient to warrant the court in excluding the con-
fession. State v. Armstrong, 203 Mo. 559; State v.
Woodward, 182 Mo. 411; State v. Brooks, 220 Mo. 83;
State v. Raftery, 252 Mo. 80. (b) A confession is not
to be rendered inadmissible and rejected for the reason
that it was made to an officer while under arrest or for
the reason that the officer to whom it was made held the
prisoner in custody upon an invalid process or without
any process. State v. Raftery, 252 Mo. 80; State v.
Armstrong, 203 Mo. 559. (c) There was no impro-
priety in the officers interrogating appellant with re-
spect to his participation in the crime, and the evidence
of the officers as to the confession is competent. State
v. Thomas, 250 Mo. 210. (d) A confession made by
an accused is admissible in evidence despite the fact that
his attorney was not present, or that he had not been
given an opportunity to consult with counsel. State
v. Robinson, 263 Mo. 324. (e) A confession will be
received if it was in fact voluntary, although it appears
that prior thereto and even after his arrest accused
had been threatened, or promises had been made, with-
out success, for the purpose of receiving a confession.
16 C. J. 722, par. 1478; State v. Jones, 54 Mo. 479; State
v. Hopkirk, 84 Mo. 283; State v. Keller, 263 Mo. 556.
(3) The fact that the defendant testified he did not
make the confession, or that he was punched, slapped,
beat, and kicked, and that promises of immunity were

made by the police officers at the police station did not overcome the prima-facie case and the testimony of the officers. He had the full benefit of his evidence before the jury. State v. Jones, 171 Mo. 406; State v. Stebbins, 188 Mo. 397; State v. Church, 199 Mo. 631; State v. Brooks, 220 Mo. 84.

REEVES, C.—Defendant was charged and convicted of murder in the first degree, and his punishment assessed at life imprisonment. The indictment alleged that he killed one Edna Ellis, with a razor in the city of St. Louis on November 4, 1920. His defense was an alibi. After the usual motions he has appealed, contending that a confession obtained from him by the police and used against him in the trial was not voluntary, and that without such confession there was insufficient testimony to sustain the conviction.

In the matter of the sufficiency of the testimony to convict, without the use of the alleged confession, it was shown that appellant and deceased, though bearing the same name, were not related; that they met at some place of entertainment in August, 1918, and became sweethearts, the deceased being then sixteen years of age; that the attachment thus formed resulted in an engagement, and that the appellant went to board at the home of the deceased, who resided with her mother; that during this courtship appellant gave the deceased a diamond ring, which he subsequently sold while having it temporarily in his possession, telling the deceased that he had lost it.

He failed to pay for his board, as contracted by him, and was required to leave the home of the deceased. This was followed by a breaking of the engagement. Appellant and deceased, however, met occasionally, but did not continue their former relations.

At the date of the homicide the mother was a waitress in one of the down-town restaurants, and the deceased was a stenographer for the Bell Telephone Company, with offices in the Boatmen's Bank Building.

Some controversy arose over appellant's unpaid board bill, which it was shown amounted to $95, and this was argumented somewhat by appellant's indebtedness to the deceased for money borrowed at different times, aggregating about $20. After leaving the home of the deceased and breaking the engagement, appellant gave his attention to another young woman.

On the evening of the homicide the deceased had worked until about eight o'clock at the offices of the Bell Telephone Company, 210 Boatmen's Bank Building. It was not a usual thing for her to work so late, but sometimes occurred about the first of the month because of business exigencies. Her home was at 1833 North Garrison Avenue, and as she was about to leave the office on the evening of the tragedy she telephoned her mother that she was starting for home. She left the office with Catherine Norton, another stenographer, went to Seventh and Olive Streets, where she boarded a Cass Avenue street car. This was not her usual route, but was traveled by her so that she and Miss Norton might be together. This car passed one block east of her home, on Glasgow Avenue. It was necessary for her to leave the car at the intersection of Glasgow and North Market Street, and walk west one block on North Market, and thence to her home on North Garrison Avenue. Garrison and Glasgow Avenues are parallel streets, one block apart, running north and south.

When the deceased reached North Market Street she left the car from the east side, and while waiting for it to pass on to the north, she waved at Miss Norton, and then was seen to cross diagonally from a point near the southeast corner of Glasgow and North Market Street to a point near the northwest corner of said intersection, where she was approached by a man, who had been seen loitering at or near that corner for two hours or more. This was exactly at 8:30 p. m. When last seen she was a considerable distance west of Glasgow Avenue on the north sidewalk of North Market Street. The lot immediately north of where the de-

ceased was last seen was vacant.   Failing to return
home, as expected, a search was instituted and the next
morning her body was found about fifty feet north of
North Market Street on said vacant lot, and about mid-
way between Glasgow and Garrison Avenues, and near
the place where she was last seen.   Her throat had been
cut; her  face bruised, and, according to the testimony
of physicians who examined her, death ensued within a
few minutes after the wounds had been inflicted upon
her.

Two of the State's witnesses positively identified
appellant as the man who had been loitering at the in-
tersection of Glasgow Avenue and North Market Street
during the evening, and one of them saw him approach
and follow the deceased after she had left the car and
was proceeding on her way, and when last seen they
were not far from the place where her body was found.

One of appellant's witnesses saw a man loitering
at said intersection, but did not identify appellant as
the man.   He described him as about five feet and eleven
inches tall, which, according to the testimony, was sev-
eral inches taller than appellant.   However, this witness
gave the same description as to dress.

Another witness for the State saw the same party
about 6:35 p. m., standing at the northeast corner of
Garrison and North Market Streets, as a Natural Bridge
car went west on North Market, and immediately there-
after walked east on North Market toward the point
where he was frequently seen at Glasgow and North
Market.   This witness gave the same descriptions as
that of all the other witnesses, but did not see the face
of such person, and did not identify him as appellant.
He gave the height corresponding to appellant.   De-
ceased ordinarily traveled on a Natural Bridge car,
which stopped but a short distance from her home on
Garrison Avenue.

About one week before the homicide at 11:20 p. m.
appellant and the deceased were seen together at Gar-
rison and North Market Streets.   At that time appellant

was importuning the deceased to accompany him some-
where, and the deceased, who was very angry, told ap-
pellant that she would not go with him "and further-
more I am through with you. I don't want any more
to do with you."

Appellant offered testimony by members of his fam-
ily to the effect that he was at the home of his parents
from 5:30 p. m. of the evening of the tragedy until the
next morning. The homicide occurred on Thursday
evening, and appellant was first arrested on Friday
afternoon. After being questioned at the police station
he was released, upon being admonished to remain with-
in the city for the convenience of the police in making
their further investigations. Shortly before eleven
o'clock a. m. of the next day (Saturday) he was re-ar-
rested and taken to the Dayton Police Station in a pa-
trol wagon, where he was interrogated by the police al-
most continuously until about daylight Sunday morning.
During the inquisition, continuing for a period of eigh-
teen hours, he was given no food and was not permitted
to sleep. His shoes were taken away from him, and at
one time he was stripped of his clothing. He was com-
pelled by the police to make two trips to the place where
the murder was committed, and was also required to
accompany them to the undertakers, where the body of
deceased was, and there required to look on her face.
He was slapped twice by police officials during the night,
and called a liar many times.

Early on Sunday morning he agreed to confess, and
a confession was written out giving the details of the
homicide. This was signed by him and witnessed by
several persons. The inquisition did not cease with
this written confession, but continued until a supple-
mentary confession had been obtained, and thereafter
it continued intermittently through Sunday, Sunday
night and Monday. During this time, in addition to his
written confessions, and in answer to the inquires of
newspaper reporters and police officials, he repeated the
gruesome details of the homicide, culminating in a de-

tailed oral statement made on Tuesday afternoon to the warden of the city jail, to which place he had been transferred. In his statement to the warden, he confirmed all that he had said in his written confession, and repeatedly corroborated his story of the homicide to various parties after the written confessions had been obtained.

Learned counsel for appellant argued with vigor at the bar of this court and vividly described in his argument, as well as in his brief, the treatment to which appellant was subjected by the police. His contention is that this treatment was far more severe than we have stated it. We do not feel justified in accepting the details, as urged by appellant's counsel. He grounded his argument, as well as his brief, upon the grossly exaggerated statements of appellant, made in his testimony before the court, in the absence of the jury, as to the abuse and tortures to which he claimed to have been subjected by the police. Appellant did not testify before the jury, but he did testify before the court in the absence of the jury on the question of the voluntary or involuntary nature of his confession. Appellant said that he had been beaten with rubber hose; hit with police clubs; punched with fists, and menaced in such a way all through the time of the inquisition as to force him to confess to save himself from further torture, and he brought witnesses who testified that they had seen him on Sunday morning on his third visit to the scene of the killing, and that his eyes were blackened, his face swollen and one of his ears cut.

Counsel for appellant completely overcame this testimony by his own proof, as Dr. Wheeler, the jail physician, was his witness, and he testified that he made a physical examination of appellant on Tuesday, November 9th, and that "the only abnormal condition I could find about him was a slight discoloration of the skin under the left eye. . . . He complained of a soreness in his left arm. I gave him a liniment to rub on his arm and told him it might reduce the soreness." Witness

said that he examined appellant's arm, but found no discoloration or bruises. In fact he said:

"Q. Did you find any bruises on his body? A. None whatever."

Furthermore, Mr. Finnegan, a reporter for the St. Louis Times, testifying for appellant, whom he had seen and interviewed on Sunday morning and thereafter, said that "he looked haggard and worn. I did not notice any marks on his face or hands." To this witness appellant had made a detailed statement of his guilt. This witness further testified on direct-examination as follows:

"Witness: I asked him the question, 'How is it you confessed to me on Sunday night, and on Tuesday afternoon you enter a denial?' 'Well,' he says, 'the police promised me something.' He said, 'They told me that if I would confess they would release me on bond. They said further'—continuing his story—he said, 'One of the policemen there promised to give me a written note to this effect, that I would be released on bond. He promised me that I would be released on bond if I would confess, and after the confession was made,' he said, 'I asked the officer for a copy of this agreement made and they laughed at me.' "

The foregoing testimony offered by appellant before the jury overcomes his own testimony given only before the court in the absence of the jury, and indicates that he was then seeking to discredit his confession by showing that a promise had been made to him, and sustains our statement of the facts as gleaned from the unusually and needlessly long record in the case. Other facts, as they may appear pertinent, will be stated in the course of the opinion.

I. Appellant's contention that aside from the alleged confession the facts were insufficient to make a case for the jury, and that his demurrer should have been sustained, is wholly without merit. The fact that he and the deceased had been betrothed; that the en-

gagement had been broken; that feeling had been engendered because of appellant's business relationship to the household of deceased; that about one week before the homicide he and the deceased were engaged in a violent quarrel at a late hour of the night; that at that time the deceased finally and indignantly rejected him as a suitor; that on the evening of the homicide appellant was seen and positively identified at the places where deceased would necessarily leave the street cars on her way home, whether she came by way of a Cass Avenue or a Natural Bridge car, all point to his guilt. There was the further fact that appellant was seen to approach and follow deceased to a point within a few feet of where she was murdered, and about the time when the murder must have occurred. It became a question for the jury, and this is true notwithstanding that appellant offered testimony by members of his family tending to show that he was elsewhere during the time. [State v. Jackson, 186 S. W. (Mo.) 990; State v. Moore, 225 S. W. (Mo.) 924; State v. Gulley, 272 Mo. 484, 199 S. W. 124; State v. Brown, 234 S. W. 785.]

II. However, a more serious question arises in the matter of the alleged confessions. The court admitted his admissions of guilt in evidence and appellant claims error. Before admitting such confessions the court excluded the jury and heard much testimony touching the voluntary or involuntary nature of his inculpatory statements. In reaching the conclusion that the confessions were competent, the trial court said that as there was a sharp conflict in the testimony before him he would relegate the whole matter to the jury for its determination under proper instructions. Ordinarily this was proper. [State v. Stibbens, 188 Mo. 387, 87 S. W. 460.] In this case, however, as stated, appellant testified only before the court while pursuing his inquiry as to the voluntary or involuntary nature of the confession, and made such an extreme presentation of the abuse and the scourging to which he said he had been subjected by the police, pre-

liminary to his confession, that the court found what he conceived to be an issue between these grossly exaggerated statements and the contra testimony of the police, so that he was of the opinion there was a question for the jury and not for the court.

Adverting to the undisputed facts with respect to the police inquisition, appellant was questioned almost continuously from eleven o'clock Saturday morning until the time of his confession at seven o'clock the next morning. He agreed to confess at five o'clock a. m. so that he was subjected to a rigid examination for a period of eighteen hours. During that time he was interrogated in relays by the police, and was not permitted to sleep, nor was he given food.

Police Officer Gerk, who was a large man, slapped him during the inquisition, because he said that appellant was disrespectful, and Officer Sweetin again slapped him, because he called said officer a liar. Sweetin was also a large man.

Appellant's shoes were taken from him; at one time he was stripped of his clothing; he was required to look at two bright reflectors, so that the light fell full on his face, and was forbidden to turn his face away so as to rest his eyes; he was taken to his cell for a few minutes at a time during the night, and then brought back for further interrogation; he was compelled on Saturday afternoon, and again before daylight on Sunday morning, to go with the police officers to the vacant lot, where deceased was murdered, and then while it was yet night to go to the undertaker's, and there stand before the body of the deceased, while a light was flashed on her face. He was required to put his hand on the corpse.

Under such circumstances, the confession was not voluntary, and should have been excluded by the court. [State v. Powell, 258 Mo. 239, l. c. 248, 249, 167 S. W. 559; State v. Powell, 266 Mo. 100, l. c. 107, 108, 180 S. W. 851; State v. Thomas, 250 Mo. 189, l. c. 212, 157 S. W. 330; Bram v. United States, 168 U. S. 532; 16 C. J. 720.]

The conduct of the police officers in needlessly laying hands on a helpless man while being detained without warrant deserves the severest censure. [People v. Trybus, 219 N. Y. 18, 113 N. E. 538; Hector v. State, 2 Mo. 167; 12 Cyc. 475.]

III. The circuit attorney apparently doubted the competency of said written confessions, for he did not at first offer them in evidence, but called the warden of the jail, to whom appellant had made a confession on Tuesday following the inquisition of the police that continued from Saturday morning until the following Monday. It was contended by the State's attorney that even if the original confessions were involuntary, the appellant had been removed from the influences which prompted such confessions, and that his admissions of guilt and the details thereof, as given to the warden of the city jail, were wholly voluntary. No effort was made by the State to show that the influences operating to produce the original confessions had been removed, and that the appellant was no longer dominated by such influences. This burden was on the State. If the first confession was coerced by intimidation and fear, the presumption would arise that a second confession was the product of the same influence. [16 C. J. 722; State v. Jones, 54 Mo. 478; State v. Brown, 73 Mo. 631.]

A prisoner, who had been thus subjected to such rigid inquiry with violence to his person; who had witnessed the gruesome and uncanny scenes mentioned and to whom food and sleep had been denied for so long, would not immediately thereafter be freed from the dominating influences of his experience, and a confession shortly after such treatment had ceased would, in the absence of proof to the contrary, be adjudged involuntary.

Under the circumstances, complaints with respect to the admission and exclusion of testimony during the trial need not be noticed. For the error of the court, as above stated, the case must be reversed and remanded

for a new trial, and it is so ordered.  *Railey, C.,* concurs; *White, C.,* not sitting.

PER CURIAM:—The foregoing opinion by REEVES, C., is adopted as the opinion of the court.  All of the judges concur.