THE STATE v. JAMES BUTTS, Appellant.—159 S. W. (2d) 790.

Division Two, March 13, 1942.

*Richard Arens* for appellant.

214

*Roy McKittrick,* Attorney General and *Olliver W. Nolen,* Assistant Attorney General, for respondent.

██ WESTHUES, C.—Appellant was convicted in the Jackson County Circuit Court of murder in the first degree and the death sentence was imposed. An appeal was duly taken.

A number of points were preserved for our review. The question of whether a confession of the defendant, used against him at the trial, was voluntarily made, and the question of the qualification of a juror who was challenged for cause by appellant on the ground that the juror was at the time of the trial a police officer of Kansas City, Missouri, are the two most important points.

Appellant was charged with having murdered Mary Margaret Maenhoudt, eight years old. The evidence revealed that the little girl had been brutally assaulted and then beaten to death. Her nude body was found in a weed patch where the crime had been committed. The double crime of rape ██ and murder perpetrated upon this little helpless child was most dastardly and atrocious and naturally aroused public indignation. The bill of exceptions contains over one thousand pages, but since the sufficiency of the evidence to sustain a conviction was not challenged we will state the facts as briefly as the circumstances permit. The victim of the crime lived with her parents at 3054 Oakley street. Appellant and his family lived at 6102 East 30th street. The child's body was found on a vacant plot of ground near 31st street and Topping avenue. These points are located in Kansas City, Missouri, within a few blocks of each other. At about 1:00 o'clock on Saturday afternoon, August 17, 1940, Mrs. Maenhoudt sent Mary Margaret to a grocery store, which was about two blocks from their home, for the purpose of getting some groceries. A list of the groceries to be purchased was written upon a small slip of paper. The little girl stopped at the home of her aunt, Mrs. Thelma Maenhoudt, who lived next door and who also gave her a list of groceries to be purchased. Her aunt wrote the name "Thelma" on the slip of paper. The child did not return home, and after waiting some time the mother inquired at the grocery store and learned the child had not been there. She became alarmed and she and Mrs. Thelma Maenhoudt and others began to investigate. Soon the entire neighborhood joined in the search. The police were notified and they too began an investigation. About 2:00 o'clock it began to rain and at intervals rained heavily. The body of the child was found about 6:30 o'clock by an aunt, Mary Maenhoudt, on a vacant lot surrounded by thick, high weeds and brush. An examination of the body revealed that the child had been criminally assaulted and her skull crushed.

The evidence tending to connect appellant with the crime, aside from his alleged confession, was in substance as follows: A number of witnesses testified that at about 2:00 p. m. of that day they noticed appellant and the little girl sitting together at the edge of a street not far from where the body was found. These witnesses noticed that the child had a small slip of paper in her hand. The witnesses were personally acquainted with both appellant and the child. At about 7:00 p. m. the police officers went to appellant's home and took him into custody. His clothes were wet, and when asked about his whereabouts during the day he stated that he had been at home all afternoon. Appellant's shirt, overalls and other articles were sent to the Bureau of Investigation at Washington, D. C. An employee of that department testified that when the package reached the bureau he opened it and examined the contents; that he found a slip of paper in the pocket of the shirt. This slip of paper was identified by Mrs. Thelma Maenhoudt as the paper upon which she had written a list of groceries to be purchased by the little girl. She identified the writing on the paper as her own and the name ''Thelma'' written thereon as her signature. Police officers testified that appellant was intoxicated when they arrested him. Appellant at the trial admitted he had consumed a pint of whisky during the afternoon.

The evidence pertaining to the question of whether appellant's confession was voluntarily made was about as follows: The police officers stated that appellant was taken into custody about 7:00 p. m. Saturday; that about 4:00 o'clock Sunday morning he signed a confession; that he signed another about noon Sunday and that a phonograph record of the confession was made about 1:30 Sunday afternoon. Appellant at the trial refuted these confessions and testified that he had been beaten unmercifully by the police; that he was kept up all night; that the members of his family had been taken into custody and that sometime during the night he was permitted to see his wife, two children and a son-in-law in a showup room, handcuffed together, but that he was not permitted to speak to them or they to him and that they could not see him; that he was told the family would not be released until he signed a confession; that because of all of this he signed a statement dictated to him by the police, which statement he was forced to repeat numerous times and then a phonograph record was made thereof. The county jail physician, a witness for appellant, testified that on Monday he examined appellant at the jail and found a cut and swelling on his lower lip caused by trauma; that the left ear-drum had been ruptured; that the defendant's wrists were swollen and were very tender and that he found wounds on appellant's shins.

The police officers emphatically denied that appellant had been mistreated in any manner. For the purpose of this case and in determining the question of whether appellant's confession was voluntarily made we will disregard appellant's evidence and take as

true the evidence as given by the police officers. That evidence justifies the following statement concerning the alleged confession. After appellant was arrested he was taken to police headquarters where all of his clothing was removed and he was given a white jacket and dark trousers to wear which were very much too large for him. Appellant was questioned by police officers, first one and then another, including the chief of police, from the time he reached police headquarters until the next day at noon. During this time he did not sleep, and at about 3:00 A. M. he was taken to the scene of the crime, where in the presence of a number of police officers he turned over numerous rocks and searched through the brush and weeds for the clothing of the child, which up to that time had not been found. At about 6:30 A. M. he was again taken to the scene of the crime for the same purpose, but the clothing was not found. Later during the morning someone found the clothing and appellant was again taken to the scene. At this time appellant was shown the rock under which the clothing was located and photographs were taken of appellant while he was stooping picking up the clothes. This photograph shows that he was handcuffed to a police officer and a number of officers were standing nearby. As to the conditions at the scene of the crime a police officer testified that about twelve officers were there. His testimony continued as follows:

"Q. And they had their weapons with them, didn't they? A. Yes; they were all uniformed men.

"Q. And one or two of them had their clubs out, didn't they? A. They did.

"Q. One or two had their clubs drawn back now, didn't they, ready for action? A. No; they were ready for action all right.

"Q. As a matter of fact in another few minutes they did have a little action, didn't they? A. No; we merely left the scene and went on back. They were there as protection to the defendant, Mr. Butts.

"Q. Yes; I understand. A. There were five hundred people there we approximated, all hollering at us."

Another police officer testified that appellant was very much concerned about the safety of his family; that during the night, before a confession was signed, appellant's wife, son, daughter and son-in-law were handcuffed and taken to a showup room where appellant was permitted to see them, but they, the family, could not see appellant. The members of appellant's family were released from custody on Monday. Another police officer testified that during the night appellant's wife was questioned in a room adjoining that which appellant occupied. Appellant was permitted to hear his wife state in answer to questions by the officers that appellant had not been home all afternoon. Appellant, during all of this time, was not permitted to speak with any member of his family, friends or counsel. Five or

more officers spent the major portion of eighteen hours questioning appellant, reducing the alleged confession to writing, having it signed and recording the confession on a phonograph disk. The disk of appellant's statement was reproduced before the jury. The record of this, as it appears in the bill of exceptions, revealed that the officers read defendant's confession to him, sentence by sentence, and the defendant would reply, "that's right" or "yes, sir." The record further revealed that the prisoner was at the time extremely fatigued.

We are of the opinion that the alleged confession, obtained under the above circumstances as revealed by the evidence of the State's witnesses, was involuntarily made and inadmissible as evidence against him. The question of whether alleged confessions were obtained in violation of constitutional rights has been before the courts of the land on numerous occasions. The number of these cases seem not to be on the decline despite the consistent holdings of the courts that confessions obtained by means of promises, or through fear, or violence, are inadmissible in evidence upon the trial of the accused. For recent cases in point decided by the United States Supreme Court see Lisenba v. California, numbers 4, 5, October term, 1941, 62 Sup. Ct. 620; White v. Texas, 310 U. S. 530; Chambers v. Florida, 309 U. S. 227. In the latter case the court said:

"We are not impressed by the argument that law enforcement methods such as those under review are necessary to uphold our laws. The Constitution proscribes such lawless means irrespective of the end. And this argument flouts the basic principle that all people must stand on an equality before the bar of justice in every American court. Today, as in ages past, we are not without ▮▮▮ tragic proof that the exalted power of some governments to punish manufactured crime dictatorially is the handmaid of tyranny. Under our constitutional system, courts stand against any winds that blow as havens of refuge for those who might otherwise suffer because they are helpless, weak, outnumbered, or because they are non-conforming victims of prejudice and public excitement. Due process of law, preserved for all by our Constitution, commands that no such practice as that disclosed by this record shall send any accused to his death. No higher duty, no more solemn responsibility, rests upon this court, than that of translating into living law and maintaining this constitutional shield deliberately planned and inscribed for the benefit of every human being subject to our Constitution—of whatever race, creed or persuasion."

Under the rulings of these cases the alleged confession of the defendant in the case at bar was not voluntarily made and was not admissible as evidence against him. For cases decided by this court see State v. Ellis, 294 Mo. 269, 242 S. W. 952, l. c. 955 (2); State v. Powell, 266 Mo. 100, 180 S. W. 851. The Powell case was twice before this court and this court on both appeals held the confession, obtained

under milder circumstances than those in the case before us, inadmissible because not of a voluntary nature. Note what this court had to say:

"Error before arose from the substantial fact that nine officers, for the most part police, collectively, or individually, or in pairs or trios, 'sweated' defendant continuously from 2 o'clock in the afternoon till 1 o'clock next morning, at which time, after Police Captain Stone and others of the nine, apparently in Stone's presence, had told defendant it would 'be best for him to tell the truth,' he made and signed the alleged confession in evidence. Upon this record, as upon the former, we do not credit the statements of the defendant that he was beaten and maltreated; for on this point he is overwhelmed and utterly discredited by countervailing testimony. But here upon the instant record the other identical infirmities of foundation appear affirmatively from the testimony of witnesses for the state."

See State v. Roberson, 103 So. 283, 157 La. 974, for a similar ruling. We have carefully read the cases of State v. Menz, 341 Mo. 74, 106 S. W. (2d) 440, l. c. 448, 449, 450(11, 12); State v. Williamson, 339 Mo. 1038, 99 S. W. (2d) 76, and other cases cited by the State, such as State v. Arndt, 143 S. W. (2d) 286; State v. Evans, 133 S. W. (2d) 389, 345 Mo. 398; State v. Tharp, 64 S. W. (2d) 249, 334 Mo. 46; State v. Christup, 85 S. W. (2d) 1024, 337 Mo. 776. In all of the latter cases cited, where the question of whether alleged confessions were voluntarily made was left to a jury, the evidence on the part of the State showed that the prisoner was accorded all of his rights and not subjected to any punishment either mental or physical. Mental punishment is, under certain circumstances, more cruel than physical. The continuous questioning of appellant all through the night by various officers, the questioning of his wife within his hearing, seeing members of his family in the early hours of the morning handcuffed and in custody of the police, the realization that public sentiment had been aroused to such an extent that police officers feared mob violence (which fact was impressed upon appellant) added together rendered a confession made in such circumstances involuntary as a matter of law.

On the voir dire examination of the panel of jurors it was disclosed that juror Danford Z. Engle was at the time a member of the police force of Kansas City, Missouri, and had been such an officer for the preceding eight years. Appellant challenged the juror for cause, assigning as a reason that he was a member of the police department. The challenge should have been sustained. In view of the fact that the chief of police, who was the prospective juror's superior, and other police officers were material witnesses in the case, the disqualification of the juror should not have been a debatable question. In 35 C. J. 143, sec. 9, we read:

"Trial by jury means something more than a trial by twelve men; the term imports a trial by twelve men possessing the requisite qualifications for jury duty, impartial between the parties, living within the jurisdictional limits of the court, drawn and selected by impartial and disinterested officers, duly impaneled under the direction of a competent court and sworn to render an impartial verdict according to the law and the evidence; . . ."

The primary duty of a police officer is to preserve peace. He is an officer of the law whose duties require him to come in daily contact with crime and law enforcement. He is paid out of the public treasury to devote his time to his duties. There are certainly thousands of good citizens aside from the police force in Jackson county and a sufficient number in any county of the State who can qualify for jury service. It ought not be necessary to withdraw police officers from the performance of their duties to fill a jury panel. It is bad practice to do so for the trial of civil cases, and a police officer should in no case serve as a juror in a criminal case. Would anyone say that a defendant, tried by a jury consisting of police officers, was accorded a jury trial as contemplated by our Constitution? The State argues that police officers are not disqualified for jury service by our statute Sec. 699, R. S. Mo. 1939. That does not answer the question. The statute arbitrarily exempts certain persons from jury service. It does not disqualify them. Sec. 758, R. S. Mo. 1939, is the section that disqualifies certain persons. It seems incompatible with justice that a defendant who has been apprehended by the police, and against whom police officers are going to testify, should be tried by a jury made up of police officers. Note the terse statement by this court in State v. Langley, 116 S. W. (2d) 38, 342 Mo. 447:

"In the first assignment of error in his brief, appellant challenges the correctness of the ruling in not sustaining his challenge for cause Jurors John Ball and O. M. Williams. On their voir dire examination these two jurors stated that they were deputy sheriffs but that they were not active. We think the objection of appellant was well taken. There are many reasons why a deputy sheriff should be disqualified in a criminal case, especially where the sheriff is a witness for the State, as in the case at bar. In the first place, our State Constitution guarantees a defendant a trial by an impartial jury. Section 22, article 2."

That case was reversed and the cause remanded solely for that error.

Other assignments of error need not be discussed since they arose under circumstances which are not likely to occur upon another trial. One of these assignments pertains to the argument of the prosecuting attorney, during which the mother of the victim of the crime is alleged to have shrieked, fainted and collapsed in the presence of the jury and then was carried from the court room. It is not surprising, in view of the evidence adduced detailing the horrible crime, that the mother of the victim should collapse. In case of a retrial it is hoped

that she may be spared the ordeal by not being present in the court room except when absolutely necessary.

The judgment of the trial court is reversed and the cause remanded. *Bohling* and *Barrett, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of court. All the judges concur.