**STATE of Missouri, Plaintiff-Respondent,**

**v.**

**Kenneth Adreon KIPLINGER, Defendant-Appellant.**

**No. 32917.**

St. Louis Court of Appeals. Missouri.

May 21, 1968.

Rehearing Denied June 27, 1968.

Henry G. Morris, St. Louis, for defendant-appellant.

Norman H. Anderson, Atty. Gen., Brick Storts, Asst. Atty. Gen., Jefferson City, Ray L. Siggins, Sp. Asst. Atty. Gen., Kansas City, Gene McNary, Pros. Atty., Clayton, for plaintiff-respondent.

WOLFE, Judge.

The defendant was charged with the malicious destruction of property which is a misdemeanor under § 560.395, V.A.M.S. He was convicted in a Magistrate Court and appealed to the Circuit Court. There a jury was waived and upon trial to the court he was found guilty and his punishment assessed at one year in the county jail. He appealed to the Missouri Supreme Court on the theory that a constitutional question in the case gave that court jurisdiction of the appeal. The Supreme Court found that since the point raised turned on the application of the facts to well established principles it did not involve construction of the constitution in the sense required to give that court appellate jurisdiction. 414 S.W.2d 547. For this reason the appeal was transferred to this court.

The property was a private garage which was partly destroyed by fire. It was in a residential area in St. Louis County known as Bellerive Acres. It was not attached to the residence which it served but was close to it. The fire occurred on September 29, 1962. It was discovered by a patrolman named Wamble. He was an officer employed by the City of Bel-Ridge. He was driving his police car on a routine patrol after leaving the scene of two garage fires where he had been assisting the Bel-Nor Police Department.

He was driving north on Carson Road when he noticed a very light glow in the sky to the east. He drove eastwardly on Natural Bridge Road to the entrance of Bellerive Acres, a distance of about a city

block. There is but one street into the subdivision and as he drove in he almost collided with the rear end of a light colored Ford bearing an out of state license plate. The car was parked about fifty feet from the entrance to Bellerive. He drove on up to the place of the fire which was at #6 Bellerive Acres. A garage was burning. He put in a call for the fire department over his radio and about five minutes later moved his car from the driveway so the fire department could come in. He noticed at that time that the Ford was no longer there.

Shortly after the fire was extinguished an officer named David Wendel of the St. Louis County Police arrived. He was attached to the Arson Squad of the department. He had made numerous investigations of suspected arson in nine years of service in that line of work. He had attended various seminars on the investigation of arson, trained some at the office of the Fire Marshal of St. Louis County, and had taken a course at Purdue University on arson and fire. He examined the garage. It contained two cars which were burned and the damage to the building had been extensive. Photographs had been taken by another member of the police department. In addition to the regular garage door for the entrance of automobiles there was a small door called a "walk-in door." According to the officer there was no evidence of spontaneous combustion or a short circuit in the electrical wiring. There was evidence that the fire had been started by placing trash in a pile near the "walk-in door" and igniting it. He stated that he determined that from the examination of the garage and the photographs taken the fire was of incendiary origin.

On Natural Bridge Road, about a block from the entrance to Bellerive Acres, is a service station called "Heavy's 66." It stays open all night. In the same area is a laundromat. Officer Wamble who discovered the fire and was on the night shift recalled that the defendant, Kiplinger,

was a frequenter of the service station late at night and in the early morning hours. He knew that he had driven a light colored Ford with a Florida license plate. It was a white plate with black letters, such as he had seen on the car in Bellerive Acres, and the Missouri plate at that time was maroon colored. Several times on his tours of duty Kiplinger would drive up and talk to him when he had stopped his car to talk to other police officers. These occurrences took place "anywhere between two, three, four or five o'clock in the morning."

Officer Wendel of the Arson Squad with two other officers arrested Kiplinger at approximately 11:00 P.M. on February 24, 1963, in front of a rooming house where he lived. They took him to the Police Headquarters and after he was booked and at about 12:30 on the morning of February 25, he was questioned by Officer Wendel about the fire. Kiplinger first said, according to officer Wendel, that he was at the laundromat at the time and that he knew about the fire but denied that he had any knowledge of how the fire started or that he had anything to do with it.

Wendel stated that he questioned Kiplinger for about three hours and put him in a cell at three o'clock in the morning. Again at eight o'clock, the morning of the 25th, he asked him to submit to a polygraph test and he did so. Wendel then questioned him for about an hour and returned him to his cell. He did not see Kiplinger again until 7:00 P.M. that evening when he released Kiplinger but arrested him as suspected of an act of arson that had occurred on Latty Avenue near the city limits of Bel-Ridge. He said that he talked to Kiplinger a short while at that time and he was interviewed by Captain Vasal of the St. Louis County Police Department.

Captain Vasal testified that he talked to Kiplinger briefly then about the fire in Bellerive. He said prior to conversing with Kiplinger "I told him that he would not have to say anything to anyone at any time and that the best way to help himself and the whole situation was to tell the truth and be truthful." Kiplinger stated that he had nothing to say to which Captain Vasal replied that he should "sleep on it" and that if he wanted to talk in the morning to let him know. Vasal said that the next morning the turnkey told him that Kiplinger wished to talk to him. He had Kiplinger brought in and Kiplinger stated that he was responsible for the fire. At that time Vasal turned Kiplinger over to Officer Wendel.

Wendel testified that after Kiplinger was turned over to him by Captain Vasal, Kiplinger told him that on the night of the fire he had seen two garage fires in Bel-Nor and that after he had watched these fires he went to the laundromat from where he had seen them and finished washing some clothes. He drove from there to Bellerive Acres. He got out of his car and walked up to the driveway of a house and around the garage. The "walk-in door" was open. He gathered some trash that he found there and after piling it in the northwest corner by the wall he ignited the pile with a match. He waited until he thought it was going to burn and then walked across adjoining property to his car. He drove back to Heavy's 66 Service Station and waited for the fire engine to pass. He then followed it to the fire and assisted the firemen in fighting the blaze. Wendel said that Kiplinger drew a rough sketch of the area. Shortly after he made the statement he was released on bail.

Before trial and at the time of trial the defendant moved to suppress any evidence of admissions against interest made by him on the ground that such statements were made because of duress and in violation of his constitutional rights. His contention is that he was not advised of his right to counsel and that he was interrogated at length without being informed

of his constitutional right to refuse to incriminate himself. He stated that he was repeatedly questioned throughout the night of his arrest by Officer Wendel and that he had no sleep. He said that Officer Wendel struck him with the back of his hand. When confronted with the state-.ment he had made on a prior occasion as to the time Wendel struck him, which was at variance with his testimony on the stand, he said that Wendel struck him twice.

He said that he had no food during his thirty-six hour stay in police headquarters except some soup, a bologna sandwich and coffee. He was not advised of his right to counsel but he called a lawyer whom he knew and the lawyer informed him he did not handle criminal matters. He stated he wanted to make another call but Officer Wendel would not permit him. Officer Wendel said that between periods of interrogation Kiplinger was allowed to make telephone calls and made at least ten different calls. The officer also testified that those held at headquarters were fed three times a day; at 8:00 A.M., 12:00 Noon, and 4:00 P.M. The defendant said that the officer cursed him and he cursed him back. He said that Wendel called him a damned liar and an arsonist. Wendel said that he had no recollection of calling him either but he might have done so. Kiplinger, who was 5′ 11½″ tall and weighed 210 lbs., said that he was tired, exhausted and nervous at the time he made the confession and that it was not voluntary. He said that he had not set the fire. He also stated, "I finally started to agree with them. Like he would say, 'You went here?' And I would say, 'Uh–huh.' And then he said, 'You went through the door of the garage?' I said, 'Yes,' 'You piled up trash and lit a match.' I said, 'Ok.' Then he said, 'You left and went this way.' I said, 'Ok.' And then he said, 'You got your car and drove off.' I said, 'Yes.' "

Kiplinger also testified that he had previously had a Florida license plate but he had a Missouri license at the time of the fire. Counsel for the defendant took the stand and testified that Officer Wendel told him he had struck Kiplinger with the back of his hand. The officer denied ever having told Counsel he had done so.

The defendant's first contention is that he was compelled to be a witness against himself in violation of Article I, Section 19 of the Constitution of Missouri, V.A.M.S. and that by reason of this he was denied due process of law provided in Article I, Section 10, Missouri Constitution. He also contends that his rights under the 5th Amendment of the Constitution of the United States have been violated. We are cited to State v. Bradford, Mo., 262 S.W.2d 584; Watts v. State of Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801; State v. Butts, 349 Mo. 213, 159 S.W.2d 790, 140 A.L.R. 1177; State v. Ellis, 294 Mo. 269, 242 S.W. 952, 24 A.L.R. 682; Blackburn v. State of Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed. 2d 242; State v. Williams, Mo., 369 S.W. 2d 408; State v. Bunton, Mo., 291 S.W.2d 122. Most of these cases treat of a variety of facts upon which courts have held that a confession obtained should not have been admitted. The facts range in scope from confessions given by insane and mentally incompetent defendants to confessions obtained by cruelty, violence and by "duress and mental coercion." State v. Williams, Mo., 369 S.W.2d 408, l.c. 419, supra, is close in facts to the case before us and there it was held that the question of whether the confession was voluntary or involuntary was for the jury.

■ The case before us was tried to the court and as the court judged the facts and found the confession voluntary we find no error in this. The evidence in relation to the confession was in considerable conflict and it was incumbent upon the trier of the facts to decide whether or not the confession was voluntary or involuntary. We therefore defer to the judgment of the court below.

The second point raised by the defendant is that the defendant was denied his constitutional privilege by refusing him the right to assistance of counsel or advising him that he was entitled to counsel and for the further reason that he was not advised by the police that he need not make a statement and that a statement, if made, could be used against him. We are cited to Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694; Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. The holding in these two cases is too well known to require further exposition. In Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882, the court held that Escobedo and Miranda should apply only to cases commenced after those decisions were announced. The trial here under consideration was on April 20, 1964, which was before the two decisions.

In State v. Beasley, Mo., 404 S.W.2d 689, 1.c. 692, the Missouri Supreme Court stated as follows:

"In the United States Supreme Court, '[t]he test has been whether the totality of circumstances deprived the defendant of a "free choice to admit, to deny or to refuse to answer," Lisenba v. People of State of California, 314 U.S. 219, 241, 62 S.Ct. 280, 292, 86 L.Ed. 166, and whether physical or psychological coercion was of such a degree that "the defendant's will was overborne at the time he confessed," Haynes v. State of Washington, 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513; Lynumn v. State of Illinois, 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922. The duration and nature of incommunicado custody, the presence or absence of advice concerning the defendant's constitutional rights, and the granting or refusal of requests to communicate with lawyers, relatives or friends have all been rightly regarded as important data bearing on the basic inquiry.' (Dissenting opinion of Justice White in Miranda v. State of Arizona; see also dissenting opinion of Justice Clark therein; see also Davis v. State of North Carolina, October Term 1965, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895.) We do not understand that Escobedo changed the totality of the circumstances test (as noted it considered five factors); and we consider it to be the proper test to be applied in determining the admissibility of statements offered in trials occurring prior to June 13, 1966. For trials after June 13, 1966, Miranda v. State of Arizona, October Term 1965, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, imposes new and different rules. Therefore, we consider the totality of the circumstances rule to be the test applicable to this case."

■ We apply the same rule to this case and hold as we did on the first point raised that the court did not err. We reach this conclusion for the reason that there was evidence that the defendant knew of his right to counsel and called one and the evidence did not support the conclusion that as a matter of law the confession made was involuntary.

■ The next point raised is that there was no proof of the corpus delicti. The defendant was charged, as stated, with the malicious destruction of property. It was accomplished by fire and to that extent was similar to the crime of arson. The corpus delicti in such cases is an incendiary and therefore a willful burning of property. State v. Paillou, Mo., 321 S.W.2d 445. The testimony of Officer Wendel, an expert on arson, explained in detail how he eliminated all accidental or natural causes of combustion and how he determined incendiary origin of fire. This was adequate proof of the corpus delicti.

■ The last point raised is that the court erred in quashing the subpoena duces tecum for a police report. It was issued during the course of the trial at the request of defense counsel. Counsel stated he did not know what was in the report but thought it might impeach the testimony

of Officer Wendel. The trial judge examined the report in question and quashed the subpoena. It has been specifically held that: " * * * a mere fishing expedition is not to be permitted 'upon the possibility of impeachment' * * *." State v. Aubuchon, Mo., 381 S.W.2d 807. The point is therefore without merit.

For the reasons stated the judgment of the trial court is affirmed.

ANDERSON, P. J., and RUDDY, J., concurs.