**STATE of Missouri, Plaintiff–Respondent,**

v.

**Willie SIMMONS, Defendant–Appellant.**

No. 52907.

Missouri Court of Appeals, Eastern District, Division Five.

April 26, 1988.

Merle C. Bassett, Wood River, Ill., for defendant-appellant.

William L. Webster, Atty. Gen., Karen A. King, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

SIMEONE, Senior Judge.

Appellant, Willie Simmons, was charged, tried by a jury, and sentenced for assault in the first degree and armed criminal action. Sections 565.050, 571.015, R.S.Mo., 1986. He was committed to the Department of Corrections and Human Resources for a period of fifteen years for the assault and three years for armed criminal action. He appeals contending that (1) the trial court erred in not including a "sudden passion" paragraph in the first degree assault instruction; (2) in not giving a second degree assault instruction; and (3) the state failed to prove a "serious physical injury." We affirm.

There were two completely diametrically opposed versions of the facts surrounding the assault by shooting in the early morning hours of March 2, 1986 which took place in the City of St. Louis. One version was asserted by the victim of the shooting, Debora Harris, and the other by the appellant. The jury obviously chose the victim's.

Debora Harris was a "nurse's assistant" holding a "certificate." She was employed by a health care service, but also had private patients. In November, 1985, she ran an "ad" in a County Journal Newspaper soliciting private employment concerning "nursing services." The services performed were "running errands such as going to the grocery store and also doing household cleaning." As a result of the ad, appellant called Debora. She went to his home on South Grand. He told her that he had "heart problems" and he "could not go out." She began working for him in November, 1985. She also worked for him in December and January, 1986. The employment relation terminated in January when Simmons "accused" her of some missing money. Later he apologized.

On the evening of March 1, 1986, Debora and a friend went to the "Wiz," a discotheque in Illinois, had a "couple glasses of wine" and returned to her home in St.

Louis County about 12:30. She was wearing "street clothes"—a black skirt, yellow jacket, yellow and black hose, black shoes and a fur coat. About 1:00 a.m., after Debora had just gotten home, Simmons called her and "said he was ill and needed to go to the hospital." She drove to his home and arrived about 1:30. When she arrived, she noticed that "he had vomited over the floor" and she "could smell alcohol on his breath." He asked her to sit down. She sat on the bed and he sat in a chair. They talked for a long period of time. He told her he loved her, "that he was in love with me and that he wanted me to stay there with him." She replied that she could not because she was married and had a family. Then Simmons said "Well, you definitely are going to stay here with me ... You're going to stay and I have something to make you stay." He reached from behind and "got a gun." The gun was a nickel-plated .38 caliber S and W, five-shot revolver. After a period of time, Debora said "If you're going to kill me then kill me now." She started out the door. He shot her three times in the back; she turned around and he shot her twice in the left arm. The gun kept clicking. She fell; a mirror fell on her; she "got up" and "managed to get out of the door." She went to her car. She could not unlock it and realized she left her keys in her purse in Simmons' apartment. She fell onto the street. Soon two people came and helped.

After the shots, Simmons called his landlord, William Gatlin, who lived at the same address, and told him that "I think I shot Debora" and asked him to call 911. Soon Officers Charles Marvin and Robert Siegel, who received a radio dispatch, arrived at the scene. Upon arrival, they saw two persons kneeling in the street alongside a female "lying face down in the center lane." She was conscious; she had wounds in her back and was bleeding. It was Debora. She told the officers that Simmons had shot her at his apartment. After they called for an ambulance, they went to Simmons' apartment. Simmons opened the door, and the officers asked his name. He replied and "blurted out, 'I just shot someone.'" The officers went inside. Officer

Marvin saw a "nickel-plated revolver" lying on the bed. He also saw a small, blue metal, .25 caliber automatic lying on a shelf on a desk against the wall. There were blood stains on the door and on the inner surfaces of the outer storm door. The officers placed Simmons under arrest. Simmons was "discernibly intoxicated." Simmons stated that "he had gotten so mad that he lost his mind and that he had shot her." Appellant was taken to a district station. There he was given his *Miranda* warnings, and had "calmed down considerably ... was quite visibly upset about what had happened, but less upset than he was at the scene." Simmons said that he had met Debora Harris about "four months before, that he had dated her for a short period of time ... till he had found out she was married and didn't want to have anything more to do with a married woman, and that he had broken off the relationship." He stated that about 3 o'clock that morning, she had come to his apartment, knocked on the door, and that he had let her in. Her intent was to renew or to strike up the relationship. He told the officers they were both seated on the bed and Debora became sarcastic and argumentative. "She had said various things about his manhood at which time he became enraged, picked up the pistol and shot her."

Willie Simmons testified in his own defense. His version of the events differed from Ms. Harris. He testified that he met Debora on November 14, 1985, when they were both at the sheriff's office. He was there to obtain a gun permit, and she was there to obtain a police clearance for her nursing position. Simmons and Debora struck up a conversation. The next evening, Simmons received a phone call from Debora. She came to his apartment and remained overnight. Between mid-November and early January, she came to his apartment and spent some 5 or 6 nights with him. Over the months he gave her some $435 to get her car fixed and for other necessaries. He denied he paid her for "nursing services." Around early Jan-

uary, he found out she was married and broke off his association with her.

On March 1, 1986, after he had gone to a bar and had drunk several beers, he returned home and had five "screwdrivers." He prepared to go to bed. In the early morning of March 2, 1986, Debora came to his apartment and said she had just returned from a "party" in East St. Louis and decided to stop by. She said she wanted "to inform me that she was leaving her husband and getting her own apartment." He asked if she were getting a divorce. She said, "no." He replied "Well, if you don't have a divorce, it wouldn't make any difference, because you are still married." They argued. According to Simmons, she said "I'll shoot you with your own gun, and she turned around" started to go near the desk where the .25 caliber gun was, and "reached for this automatic." Although he did not remember that she had a gun in her hand, he reached on the bed, "grabbed the .38 and started shooting." He stated he "was scared to death," and that "his life was in danger." After the shooting, she left the room. He called his landlord, and the police came.

On cross-examination, he denied that he "paid [Debora] for sex." He was asked "So you don't mind having sex with somebody you just meet and then the next day that morning when they leave your house giving them a $100?" He was also asked whether he considered himself a "moral man." He answered "no," but "nor do I consider myself immoral." He remembered talking to the police officers, but did not remember telling them he was "mad." He did admit he was angry. He admitted he shot Debora with the gun.

A medical records secretary testified that Debora was admitted to the hospital on March 2, 1986 and discharged May 7, 1986. She had "multiple gun shot wounds." Debora had a "hemorrhage in the left side which was treated by chest tube." She also had an exploratory "laparotomy" which failed to find any significant "visceral injuries." Debora testified that later she had a lung infection.

At the instruction conference, the court noted that defense counsel asked for a "sudden passion mitigation" paragraph to be inserted in the first degree assault instruction. When the court inquired of defense counsel "what created the situation that made the defendant so mad that he shot the victim," defense counsel stated that Debora told him she would shoot him with his own gun and that she reached for it, and that's the grounds for the self-defense instruction. Under these circumstances, the court denied the request for a "sudden passion mitigation" paragraph because the court believed such a paragraph would be inconsistent with a self-defense instruction. The court also denied a lesser included assault second degree instruction, MAI–CR 3d 319.12, because "I believe that the only other alternative is to give a recklessly caused serious physical injury instruction," and a "self-defense instruction is inconsistent with that."

After arguments, the jury was instructed on first degree assault, MAI–CR 3d 319.02, without the "sudden passion mitigation" paragraph, self-defense, MAI–CR 3d 306.-06, and armed criminal action. Serious physical injury was defined. The jury returned verdicts of guilty on both counts and assessed punishment at fifteen years for assault and three years for armed criminal action.

On February 20, 1987, the court sentenced the appellant to fifteen years for assault, first degree and three years for armed criminal action. In due time, defendant appealed.

The thrust of appellant's contentions on appeal are that (1) the state failed to prove defendant's guilt of assault in the first degree because it did not prove appellant caused "serious physical injury," (2) the court erred in refusing to include a "sudden passion" paragraph in the first degree assault instruction and refusing to submit a second degree assault instruction, and (3) the prosecutor's improper cross-examination deprived him of a fair trial.

He contends that the indictment charged, and the court instructed, that appellant "knowingly caused serious physical inju-

ry," that serious physical injury is one that "creates a substantial risk of death, or that causes serious permanent disfigurement or protracted loss or impairment of the function of any bodily member." [1] He argues that there was no risk of death; there was no testimony of any disfigurement, or that the victim lost the function of any "bodily member or organ." Appellant contends that the "mere fact that the victim was shot five times does not establish serious injuries." Hence the state did not sustain its burden.

Appellant also contends that assault in the first degree is "mitigated" to assault in the second degree when the defendant acted under the influence of sudden passion arising out of adequate cause, [§ 565.-060(1)(1)], and that whenever upon the whole record, once such evidence has been introduced, the sudden passion paragraph should be given. He urges that there was evidence that appellant was angry at the victim and shot her "because of this anger." The anger, appellant states in his brief, arose because "she attacked his manhood and threatened to shoot him." [2] Hence, sudden passion was supported by the record and is not inconsistent with the self-defense instruction, so that if the instructions were given, the jury could have believed that a "lovers' quarrel" occurred and the victim's "actions" provoked appellant. Appellant lastly contends that the jury was not instructed about the state's requirement to disprove sudden passion.

■ First degree assault requires an attempt to kill or knowingly cause serious physical injury to another person. Section 565.050, R.S.Mo., 1986. "Serious physical injury" is defined as "physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any

part of the body." Sections 556.061(26); 565.002(6). Assault in the second degree is committed when a person "knowingly causes" physical, not serious, injury by means of a deadly weapon or dangerous instrument. Section 565.060. "Physical injury" is any physical pain, illness or impairment of a physical condition. Section 556.-061(20).

We find no merit to appellant's first point that the state failed to prove that the appellant caused "serious physical injuries" so as to be convicted of first degree assault.

Courts have had numerous occasions to examine "serious physical injury." A "serious physical injury" was held to be such in *State v. White*, 738 S.W.2d 590 (Mo.App. 1987), where a shot pierced the left lower lobe of the lungs, and injured the pulmonary artery branch of that lobe. In *State v. Williams*, 740 S.W.2d 244 (Mo.App.1987), the defendant "cut" the victim twice with a knife—once in the forearm and once in the neck. The victim bled profusely. The victim had a five-inch laceration on the side of her neck and a two-inch laceration on her arm. We held that this evidence was sufficient to show serious disfigurement.

In *State v. Emory*, 643 S.W.2d 24 (Mo. App.1982), a beating which resulted in a broken arm, a concussion and numerous lacerations was held to be a "serious physical injury." We pointed out that the defendant's argument that serious physical injury was unsupported by the evidence because of the victim's recovery, without residual damage, was "patently frivolous." *State v. Emory, supra*, 643 S.W.2d at 27.

In *State v. Briggs*, 740 S.W.2d 399 (Mo. App.1987), we held that an "indisplaced fracture" or a "cracked" rib was a serious physical injury that caused "impairment of the function of any part of the body," and

---

**1.** Prior to the amendment in 1983, "serious physical injury" was defined as "physical injury that creates a substantial risk of death or that causes serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." Section 556.061, R.S.Mo., 1978. In 1983, the section was amended so that "serious physical injury" is defined as "physical injury that creates a substantial risk of death or that causes serious disfigurement or

protracted loss or impairment of the function of any part of the body." S.B. 276, Laws, 1983.

**2.** Appellant did not testify that he was angry because "she attacked his manhood." He testified that she threatened to shoot him. The police officers testified that Simmons told them Debora said things about his manhood.

that the injury was protracted. Protracted means something short of permanent but more than of short duration. What is considered protracted depends on the circumstances. *State v. Mentola*, 691 S.W.2d 420, 422 (Mo.App.1985). See also *State v. Davis*, 689 S.W.2d 743 (Mo.App.1985) (broken jaw, cut and bruised eyes, neck and face); *State v. Teal*, 624 S.W.2d 122 (Mo. App.1981).

Under these authorities, we hold and believe that the evidence which shows that Debora Harris was shot five times with a .38 caliber S and W, nickel-plated, five-shot revolver, three times in her back, and twice in her arm, which lodged close to her spine, that she hemorrhaged on the left side which was treated by a chest tube, that she was hospitalized for five days, and unable to work for three months, and was not able to perform her normal duties, and, a short time prior to trial suffered an infection in her respiratory system—all constitutes a serious physical injury which created a substantial risk of death and a protracted impairment of the function of her body. Sections 556.061(26); 565.002(6).

Appellant relies on *State v. Mentola, supra*, 691 S.W.2d 420 and *State v. Ellis*, 639 S.W.2d 420 (Mo.App.1982). Those decisions are not dispositive or controlling. They are distinguishable.

We find this point urged by appellant to be without merit.

■ In his second point, appellant contends that there was evidence of "sudden passion" arising out of "adequate cause," so that the court erred in refusing to instruct on second degree assault, a Class C felony. He contends that whenever any evidence of such defense appears upon the whole record, "however improbable" and whether or not consistent, the court must submit the defense. *State v. Cook*, 696 S.W.2d 814, 817 (Mo.App.1985) (accident and self-defense).[3] Here, appellant contends that there was evidence that he was "angry," "mad" and that the victim "enraged" him. Because the jury could have believed that a "lovers' quarrel" occurred, and Debora's "actions" provoked him, it is said that there was evidence of sudden passion arising out of adequate provocation.

■ The Notes on Use to MAI–CR 3d 319.02, 319.06, state that assault in the first degree is "mitigated" to assault in the second degree when the defendant acted under the influence of sudden passion arising out of adequate cause. The defendant has the burden of injecting the issue.[4] Paragraph (Second)—sudden passion—should not be used unless supported by evidence of this mitigating factor. Once such evidence has been introduced, paragraph (Second) must be used. Assault in the second degree is a lesser included offense. *See* Notes on Use, MAI–CR 3d 319.-02.3. An instruction on a lesser included offense is required only if the evidence of probative value could form a basis of acquittal of the higher offense and a basis for conviction of the lower. *State v. Olson*, 636 S.W.2d 318, 322 (Mo. banc 1982); *State v. Williams, supra*, 740 S.W.2d at 246; *State v. White, supra*, 738 S.W.2d at 592.

We must determine therefore, whether the "lover's quarrel," Debora's statements about appellant's manhood, and the testimony of the police officers that appellant said he was mad, angry or outraged was sufficient sudden passion arising out of

---

3. Accident and self-defense may no longer be submitted. Section 563.070, R.S.Mo., 1986. *State v. Branch*, —— S.W.2d —— (Mo.App.1988) No. 52614, Eastern District, March 29, 1988.

4. Section 565.060(2) states that the defendant has the burden of injecting the issue of influence of sudden passion arising from adequate cause. Section 556.051 states that when the phrase "the defendant shall have the burden of injecting the issue" it means (1) the issue referred to is not submitted to the trier of fact

unless supported by evidence. Section 556.-061(2) states that the "burden of injecting the issue" has the meaning "specified in section 556.051." This has been construed to mean that an accused can meet the burden if evidence is introduced from whatever source, and if there is evidence to support the issue, the burden rests on the prosecution to prove it beyond a reasonable doubt. *State v. Fincher*, 655 S.W.2d 54, 58 (Mo.App.1983) (self-defense).

adequate cause so as to support a second degree assault instruction.

Sudden passion means "passion directly caused by and arising out of provocation by the victim ... which passion arises at the time of the offense and is not solely the result of former provocation." Section 565.002(7), R.S.Mo., 1986. Adequate cause means "cause that would reasonably produce a degree of passion in a person of ordinary temperament, sufficient to substantially impair an ordinary person's capacity for self-control." Section 565.002(1); *State v. Denney*, 725 S.W.2d 921, 923 (Mo. App.1987).

 The terms "sudden," "passion" arising out of "provocation" and "adequate cause" have been the source of interpretation in judicial decisions for decades. To be "adequate," the provocation must be of a nature calculated to inflame the passions of the ordinary, reasonable, temperate person. In order for an offense to be reduced to one less culpable, there must be a sudden, unexpected encounter or provocation tending to excite the passion beyond control. Passion may be rage or anger, or terror, but it must be so extreme that for the moment, the action is being directed by passion, not reason. R. Perkins, *Criminal Law*, 66 (1969). In addition, the offense must have been done in a sudden passion and not after there has been a time for the passion to cool. Furthermore, while words, gestures or other actions may give rise to provocation it was the rule at common law and the general long-standing rule in Missouri that words, no matter how opprobrious or insulting are not sufficient to show "adequate provocation."[5] See *State v. Starr*, 38 Mo. 270, 277 (1866). *Perkins, supra*, at 61; *State v. Harris*, 717 S.W.2d 233, 236 (Mo.App.1986); *State v. Gordon*, 191 Mo. 114, 89 S.W.2d 1025, 1029–30 (1905); *State v. Niederschulte*, 750 S.W.2d

491 (Mo.App.1988).

In *State v. Denney, supra*, 725 S.W.2d 921, the defendant confronted his wife with the pros and cons of the marriage. The defendant inflicted numerous injuries with a crowbar. The Western District held that there was no evidence of sudden passion arising out of adequate cause and affirmed a first degree assault conviction.

In *State v. Fincher, supra*, a homicide case, the victim made a "gesture" by raising his arms with closed fists. This was insufficient to support a self-defense instruction.

In *State v. Davis, supra*, after a protracted "lovers'" quarrel, the defendant beat and kicked the victim. Her jaw was broken, and her face, neck and eyes were cut and bruised. No provocation was found.

Under the evidence in the record, there was no legal evidence of the mitigating factor—sudden passion arising out of adequate cause. The evidence in the light most favorable to the appellant showed that Debora and Simmons conversed in the room for a long period of time. Therefore, there was no sudden passion which directly arose out of any provocation by Debora. Neither was there "adequate cause" or such provocation recognized by law to reduce the offense to second degree assault. While there may have been passion, there was not such passion so as to render a person of ordinary temperament incapable of reflection or such passion to obscure reason.

 Furthermore, while it is true that a defendant is entitled to an instruction, even if the theories are inconsistent, *State v. Lora*, 305 S.W.2d 452, 455 (Mo.1957); *State v. Carothers*, 743 S.W.2d 489, 491 (Mo.App. 1987), and while many theories,[6] including sudden passion arising out of adequate

---

5. See the long line of Missouri decisions in *annot., Insulting Words—Provocation*, 2 A.L.R. 3d 1292 (1965) beginning with *State v. Starr*, 38 Mo. 270 (1866). There must be at least a "pulling" or "tweaking" of the nose. For a history of the "tweaking of the nose" requirement, see

Hunvald, *Criminal Law in Missouri*, 27 Mo.L. Rev. 1, 5, n. 19 (1962).

6. *State v. Lora, supra*, (insanity and alibi); *State v. Morris*, 248 S.W.2d 847 (Mo.1952) (insanity and self-defense). The test is whether one theory necessarily disproves another.

cause and self-defense are not so inconsistent that they cannot be given together, yet under the particular facts and circumstances of this case, there was no error in refusing to submit sudden passion.

At the instruction conference, when the court inquired about what created the situation that made the defendant so mad, defense counsel stated that Debora told him that she would shoot him with his own gun and she reached for it. That was the basis for giving the self-defense instruction. The provocation was Debora's reaching for the gun, as appellant so testified, and was not directly the quarrel. Hence, under these circumstances, the giving of the self-defense instruction was proper and we conclude that, in this case, there was no error in refusing to instruct on sudden passion, because under the evidence such an instruction would be inconsistent with self-defense.

The trial court, therefore, did not err in this regard since (1) there was insufficient evidence of sudden passion arising out of adequate cause, and (2) an instruction on sudden passion would have been, in this case, inconsistent with self-defense.

■ Neither did the court err in refusing to give a lesser included second degree assault instruction, on the ground as the court stated that a recklessly caused serious physical injury instruction would be inconsistent with self-defense.

MAI–CR 3d 319.12 provides for two situations (1) "knowingly caused physical injury," and (2) "recklessly caused serious physical injury." Since the first degree assault instruction instructed on "knowingly caused serious physical injury," it would have been inconsistent for the court to give a "recklessly caused serious physical injury" instruction with the instruction on self-defense. Section 562.016(4) states that a person acts recklessly when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. The appellant's conduct—shooting Debora in the back three times and twice in the arm and continuing to pull the trigger so that Debora heard clicking was more than reckless; it was knowingly done. Refusing to give a second degree assault instruction with language that the conduct "recklessly caused serious physical injury" was not error.

Appellant next complains that the state did not prove that the defendant did not act in the heat of passion or that defendant did not act in self defense.

The court instructed on self-defense which instruction informed the jury that the burden of proof beyond a reasonable doubt was upon the state. The jury so found. Hence this contention is without merit.

As to the failure of the state to prove that appellant did not act under the influence of sudden passion arising out of adequate cause, appellant relies on *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) contending that due process requires that the state disprove sudden passion beyond a reasonable doubt. *Mullaney* held that the due process clause requires the prosecution to prove beyond a reasonable doubt the absence of "heat of passion" on sudden provocation when the issue of passion is properly presented. Under the facts here there was no evidence to prove sudden passion upon adequate provocation. *Mullaney* is inapposite.

■ Lastly, appellant contends that the prosecutor's improper cross-examination of Simmons deprived him of a fair trial in that his character was attacked in asking him about "having sex" and being a "moral man." When the prosecutor inquired on cross-examination whether appellant considered himself a moral man, no objection was made. While it is improper for the cross-examiner to delve into the witness' reputation for chastity, *State v. Williams,* 492 S.W.2d 1, 4 (Mo.App.1973), there was no prejudicial or plain error. Rule 30.20. As to other questions, where objection was made, the trial court has wide discretion as to the extent of cross-examination. *State v. Morris,* 668 S.W.2d 159, 164 (Mo.App. 1984). There was no prejudicial error.

Having considered the points raised by the appellant and finding no prejudicial error, the judgment of conviction is affirmed. The cause was competently tried and the appellant was accorded a fair trial.

Judgment affirmed.

CARL R. GAERTNER, P.J., and GRIMM, J., concur.