**STATE of Missouri, Plaintiff/Respondent,**

v.

**Dennis BLACKMAN,
Defendant/Appellant.**

No. 62446.

Missouri Court of Appeals,
Eastern District,
Division Two.

Feb. 8, 1994.

Application to Transfer Denied
May 26, 1994.

Henry R. Robertson, St. Louis, for defendant, appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Elizabeth L. Ziegler, Asst. Atty. Gen., Jefferson City, for plaintiff, respondent.

CRANE, Presiding Judge.

A jury found defendant, Dennis Blackman, guilty of the offense of second degree murder in violation of § 565.021 RSMo 1986 in connection with the shooting death of a St. Louis County police officer. The trial court sentenced him to life imprisonment. Defendant appeals the judgment of the trial court.

On appeal defendant contends that the trial court erred in refusing to instruct on sudden passion arising from adequate cause and voluntary manslaughter, in excluding psychiatric testimony on the voluntariness, weight, and credibility of his statements to police, in overruling his motion to suppress his statements to police, in overruling his objection to the admission of his indictment for rape, in excluding a third party's statement that the third party had killed the "lady police officer," in overruling his motion to exclude hypnotized witnesses, and in failing to instruct on self-defense. We affirm the judgment of the trial court.

## FACTUAL BACKGROUND

The sufficiency of the evidence is not in dispute. In January, 1991 defendant was living with his parents and awaiting trial on charges of rape, kidnapping and sexual abuse in the first degree. He had been released on bond on February 15, 1990. One of the conditions of his release was that he be under the constant supervision of his parents or a named family friend. The order provided: "Any violation of any of these conditions, no matter how slight, will result in the immediate revocation of the bond and incarceration of defendant."

Defendant's father, a St. Louis City Police captain, was authorized to carry, off-duty, a Colt .38 special revolver, and to use Winchester Western silver-jacketed bullets with the weapon. Defendant's father last saw his revolver on December 7, 1990 and, when he could not find it, reported it missing.

Defendant told his friend, Ronald Carter, that he had stolen his father's revolver from the trunk of his father's car and showed it to him five or ten times between December, 1990 and February 15, 1991. In December, 1990 defendant brought the revolver to another friend's house and showed it to a group of friends. He kept the revolver and bullets concealed in a hole in his parent's basement ceiling.

On January 10, 1991, defendant and Carter made plans for defendant to sneak out of his house after 10:00 p.m. Carter did not come because he was unable to get a car.

Beginning at approximately 12:50 a.m. on January 11, a number of motorists saw a man of defendant's race and approximate height and weight in the vicinity of Old Halls Ferry Road, Mehl Road and Patricia Ridge. He was walking in the street and staring at cars as they drove by. One driver saw the man stumbling and rocking back and forth as he walked toward Patricia Ridge. She reported this behavior to St. Louis County Police Officer Joann Liscombe at a nearby 7–Eleven store. Officer Liscombe said that she would look into it.

At 1:13 a.m., Officer Liscombe reported to the dispatcher that she was on a "pedestrian check". Meanwhile, another driver, Steve Carter, saw the man at the corner of Old Halls Ferry and Patricia Ridge. As Carter turned the corner, the man gave him a "frightening" look, causing Carter to lock his car door. Carter saw Officer Liscombe pull up, stop in the intersection and turn her spotlight toward the man. The man initially tried to run away up a hill but was unsuccessful because of the amount of ice on the ground. He saw Officer Liscombe get out of her car and walk toward the man.

After overhearing the report in the 7–Eleven store, Charles Myers decided to drive by the area. As he drove by, he saw Officer Liscombe standing face to face with the man. Officer Liscombe looked at Myers as he passed them, and then turned her head back toward the man. The man never took his eyes off Officer Liscombe.

Meanwhile, the dispatcher tried to reach Officer Liscombe but received no response. The dispatcher called for another car to check on her. As another motorist approached the intersection of Old Halls Ferry Road and Patricia Ridge, he saw Officer Liscombe lying on the ground with blood on her hand and in her hair. Her flashlight and glasses were lying several feet away and her gun was missing from its holster. He and other motorists came to her assistance. The first police officer arrived at 1:23 a.m. All noticed a massive head wound. She was eventually taken to a hospital.

Officer Liscombe was in shock upon arrival at the hospital and never regained consciousness. She had two bullet wounds in close proximity to the right side of her head, both of which were fatal. She also suffered a gunshot wound to her left hand which entered through her palm and would have immediately incapacitated her hand. She had a horizontal linear wound to the back of her head, caused by a blunt object, which split open her scalp and extended to her bone. This wound would have caused a momentary, stunning reaction sufficient to knock her to the ground, but not to lose consciousness. She also suffered a linear bruise to her thigh and numerous contusions to her legs. Several fingernails had broken off and the fragments were found at the scene, indicating a struggle. Blood patterns on her shirt indicated she was lying down when she was shot in the head. Officer Liscombe died on January 14, 1991.

The bullet fragments recovered from Officer Liscombe's head were of two different types: a Winchester silver tip hollow point bullet jacket and bullet core, later determined to have been fired from defendant's father's stolen Colt .38 revolver; and a Remington Peters .38 Special copper bullet jacket and bullet core which could have been fired from Officer Liscombe's duty revolver, a Smith & Wesson .357 Model 686 polished stainless steel revolver with Pachmeyer grips, which had not been recovered by the time of trial.

At the scene of the shooting, investigators also recovered a lead bullet core and a copper bullet jacket fragment, consistent with a Remington Peters .38 Special, and three spent Winchester silver tip hollow point bullets which had been fired from defendant's father's revolver.

Officer Liscombe's police car was missing from the scene. Officers found it at 1:35 a.m., approximately six-tenths of a mile from the scene of the shooting and two-tenths of a mile from defendant's home.

On February 15, 1991, Ronald Carter asked defendant for his father's revolver. Carter had learned that his probation was going to be revoked and wanted the revolver, about which the police had previously questioned him, to bargain with the police. Defendant gave Carter the gun and a plastic bag containing two types of bullets.

Carter was arrested for shoplifting the next day. On February 18, he told the police that he had Captain Blackman's revolver in his possession. Police accompanied him to his home where he gave them the revolver and a plastic bag containing ten silver hollow point bullets and four copper tip hollow point bullets. Carter told them defendant had given him the revolver and bullets on February 15. Carter later gave police a billy club which Carter said he received from defendant a few days before defendant gave him the gun. The revolver was one of the firearms used to kill Officer Liscombe and both types of bullets in the plastic bag were the same two types of bullets which had killed Officer Liscombe.

## DEFENDANT'S STATEMENTS

Defendant was initially questioned by police on January 15, 1991. At that time, he denied involvement in the crime. When he was told that police were interested in finding his father's Colt .38 revolver, he stated that he believed Ronald Carter may have stolen the gun.

Defendant was next questioned by police on February 7. Police advised him of his *Miranda* rights. Defendant verbally acknowledged he understood them and initialled each right but refused to sign the waiver of rights form. Defendant stated that his father had told him not to sign anything. However, he said he would waive his rights and talk to police. Police questioned defendant about an unrelated matter, then stopped the interview for two and a half hours while defendant participated in a lineup.

When they returned the police readvised defendant of his rights and he signed the waiver and warning form. Police then questioned him about the Liscombe shooting. Defendant denied being out of his house the night of the homicide, or at any time unaccompanied, since January of the previous year. Defendant stated that on the evening of January 10 he had watched television in his basement until approximately 1:30 a.m. the next morning. He stated that he believed his father's Colt .38 revolver had been stolen from the trunk of his father's car and that he no longer thought that Ronald Carter had stolen it. He denied seeing Carter for approximately a year.

On February 19, 1991 at approximately 8:00 a.m., six officers of the Tactical Operations Unit executed a search warrant at defendant's home and defendant was arrested for Officer Liscombe's murder. While Detective Frank Savetz and Lieutenant John McCrady transported defendant to the station, Det. Savetz verbally informed defendant of his *Miranda* rights. Defendant acknowledged he understood them. Defendant then asked why the police were searching his house. Det. Savetz told him the police were looking for Officer Liscombe's missing .357 revolver and defendant responded "Well, you're not going to find it there."

At 8:30 or 8:40 the police arrived at their station and placed defendant in an eight by seven foot interview room. At about 9:00 a.m. Det. Savetz and Detective William Ostendorf advised defendant of his *Miranda* rights using a warning and waiver form. Det. Savetz read each right aloud as defendant read his copy. Defendant indicated his understanding of each right verbally and by initialling each right after it was read. After Det. Savetz read the waiver paragraph aloud, defendant stated he understood it and would answer questions but would not sign the form because his father told him not to sign anything. The defendant did not ask for a lawyer. Defendant behaved normally during the morning interview.

Det. Savetz and Det. Ostendorf informed defendant that the police had recovered his father's stolen Colt .38 revolver from Ronald Carter and that it was one of the weapons used to kill Officer Liscombe. Defendant denied giving Carter the gun. Det. Savetz left after one-half hour and Det. Ostendorf continued the questioning until approximately 11:30 a.m. when defendant was given lunch.

No one spoke with defendant until 1:00 p.m. when Detective David Glenn and Det. Ostendorf proceeded to talk to defendant for about one-half hour. They told defendant the information they had, but did not question him. The detectives then left defendant alone in the interview room for several hours during which Det. Ostendorf intermittently inquired if he needed a drink or use of the restroom, and provided water or a soft drink when defendant requested either.

At approximately 4:00 or 4:30 p.m., Lt. McCrady brought Ronald Carter in to talk with defendant on Carter's request. Defendant and Carter were alone but their conversation was monitored. They spoke about the weapon used in the shooting. Carter told defendant that in the past defendant fainted or lost consciousness without any memory of the occurrence. Defendant and Carter then requested to speak to Sam Yarbrough, a civilian police administrative employee, who entered the interview room about 6:00 p.m.. They asked Yarbrough questions about dual personalities and memory lapses and whether he thought these were possible. At some point Carter was removed from the room while Yarbrough was talking to defendant. Yarbrough spoke with defendant until 7:00 p.m.

At the close of defendant's conversation with Yarbrough, he started talking in a loud boisterous tone and said that he felt he need-

ed to be restrained or he "might go out and kill another police officer." This caused Detectives Glenn, Ostendorf and Dave Ventimiglia to enter the room and tell defendant it was time to go. Defendant stated he was not going anywhere. Then his facial expression changed, his face reddened, and he took a few steps and fell towards the detectives. The detectives took hold of him and lowered him to the ground. They then handcuffed defendant and set him up in a chair. He asked them what had happened. The detectives were not sure defendant had fainted because the incident lasted only a few seconds and his body remained tense or rigid while falling. Defendant stated immediately afterwards that he was fine and did not appear to need any medical assistance.

Defendant was then moved to another building for lineups which took one and a half hours. His physical condition appeared fine. Defendant was fed while at the other building and returned to the interview room at approximately midnight.

Detectives Ostendorf and Glenn began questioning defendant at 12:05 a.m. The detectives decided to record defendant's statements because of the change in his voice and behavior earlier that evening. During this interview defendant told them that he had another personality, "Death." He related that on the night of the shooting he had given his gun to a small white man and asked that man to shoot him. Defendant said that Officer Liscombe saw defendant, but not the other man, and asked defendant if he was alright and if she could give him a ride home. When defendant said he would walk, she turned around to leave. At that time the small man shot at her and missed. She turned around and tried to get her revolver out. He kept firing, hit her in the hand, then he got her gun, shot her with it and left in her car.

This interview continued for 55 minutes until defendant yelled at Det. Ostendorf to leave the room, which he did. He told Det. Glenn to stay and later reminded him he had not said he could leave. However, a few minutes later he yelled at Det. Glenn to leave, which he did.

At approximately 1:00 a.m., Det. Ventimiglia and Yarbrough entered and began interviewing defendant. Yarbrough testified defendant's physical condition appeared to be the same as it was one month prior during a polygraph examination and during the earlier discussion that evening. They began this interview by discussing defendant's "good side" and "bad side" and getting help for multiple personalities. They urged him to have his "good side" tell what the "bad side" had done.

Defendant then said that Officer Liscombe had come up to him, asked him what he was doing, if he had a car, and if he had been drinking or using drugs, then put her flashlight in his eyes, pushed his hand away from his eyes, used a racial slur, pulled out her gun and fired it. He ducked, pulled his gun and heard it go off six times. "Then I'm holding hers in my right hand and I'm shooting left handed but I'm not left handed, then I take off running, and then I'm in her car, (pause) and then I'm at home in my bathrobe." He said he threw her gun away.

Defendant went over this account again. He said that he got mad when she tried to shoot him. He then shot her in the chest and got her gun and kept it from her when she tried to get it back. She turned and ran and he shot her in the hand. She tried to get her gun back and he fell on top of her and his gun accidentally went off at her head. He said he may have shot her again when she was on the ground, but he denied hitting her or using her weapon. He admitted taking his father's gun and said Ronald Carter had told them the truth. This interview lasted forty-five minutes and is referred to in defendant's brief as the "second taped statement."

### TRIAL COURT PROCEEDINGS

Defendant was indicted for first degree murder and armed criminal action. Trial began on June 1, 1992. In his defense defendant testified he was home at the time of the shooting and did not remember making any statements to the police. The jurors were instructed on first and second degree murder and alibi. The jury returned its verdict on June 13, 1992, finding defendant guilty of

second degree murder. On June 14, 1992 the jury assessed punishment at life imprisonment.

## ISSUES ON APPEAL

Defendant raises seven issues on appeal. We will address points one and seven together and then address the remaining points in the order raised.

## I.

### Refused Jury Instructions

In points I and VII defendant contends the trial court erroneously refused to instruct on sudden passion arising from adequate cause and voluntary manslaughter and failed to instruct *sua sponte* on self-defense. He argues that these instructions were supported by the statements he made in his second taped interview. We disagree.

The trial court instructed the jury on first degree murder, MAI–CR3d 313.02, and second degree murder, MAI–CR3d 313.04, and, on defendant's request, the defense of alibi. Defendant also tendered instructions submitting the special negative defense of sudden passion arising from adequate cause based on MAI–CR3d 313.04 and defined in MAI–CR3d 333.00 and voluntary manslaughter based on MAI–CR3d 313.08. The trial court refused these instructions. Defendant did not tender a self-defense instruction and the trial court did not instruct on self-defense.

### A. Sudden Passion/Voluntary Manslaughter

Defendant argues that if there was mitigating evidence of sudden passion he was entitled to have the murder second instruction modified to negate the issue of sudden passion and to have the jury instructed on voluntary manslaughter. He argues that the evidence that he acted under the influence of sudden passion arising from adequate cause was contained in his second taped statement to police where, as he states in his brief, "he said the victim shined her flashlight in his face, pushed his hand away when he tried to shield his eyes, said niggers weren't allowed to walk her streets at night, and fired a shot past his ear."

Acting "under the influence of sudden passion arising from adequate cause," § 565.023.1(1), is a special negative defense to the crime of conventional second degree murder. *State v. Werner*, 810 S.W.2d 621, 623–24 (Mo.App.1991). If there is evidence that defendant killed the victim under the influence of sudden passion arising from adequate cause, an instruction submitting conventional murder in the second degree must submit, as an element of the crime, a third paragraph "that defendant did not do so under the influence of sudden passion arising from adequate cause." *Id.* at 624. Further, the trial court must also give MAI–CR3d 313.08 on voluntary manslaughter. 565.023.-1(1), RSMo (1986); MAI–CR3d 313.04 Notes on Use 4; *Werner*, 810 S.W.2d at 624. The burden of injecting this issue is on the defendant. MAI–CR3d 313.04, Notes on Use 4; *Werner*, 810 S.W.2d at 624.

"Sudden passion" means "passion directly caused by and arising out of provocation by the victim ... which passion arises at the time of the offense and is not solely the result of former provocation." § 565.002(7). "Adequate cause" means "cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self control." § 565.002(1). In *State v. Simmons*, 751 S.W.2d 85, 91 (Mo. App.1988), we stated that for "adequate cause" to exist

> there must be a sudden, unexpected encounter or provocation tending to excite the passion beyond control. Passion may be rage or anger, or terror, but it must be so extreme that for the moment, the action is being directed by passion, not reason. R. Perkins, *Criminal Law*, 66 (1969).

As we further stated in *Simmons*, "[T]he offense must have been done in a sudden passion and not after there has been time for the passion to cool." *Id.*

In his statement defendant said the victim's comments did not provoke him, but, "Next thing I know, I getting mad cause she just tried to shoot me." He said in his interview, "Nobody shoots at me, nobody." He then drew his gun, shot the victim in the

chest, took her gun away, and shot her in the hand as she was running away. Although he says he got mad, he does not describe *extreme* rage, anger, or terror directing his actions beyond his control. *See State v. Lett*, 715 S.W.2d 557, 560 (Mo.App.1986).

However, whether extreme emotion or reason governed defendant's original decision to draw his weapon, fire at the victim and take her gun away, defendant's statement is clear that the fatal shots were not generated by any emotion but by a physical accident. According to defendant's statement, after the victim was wounded and ran away, there was a new encounter in which she attempted to get her revolver back from defendant and fell down, causing defendant to fall on her and accidentally fire his weapon into her head. Defendant's statement does not support an instruction to the effect that at the time he fired the fatal shots he did so under the influence of sudden passion arising from adequate cause.

The trial court did not err in refusing to instruct on the special negative defense of sudden passion and on voluntary manslaughter. Point one is denied.

## B. *Self–Defense*

In his seventh point defendant asserts the trial court erred in failing to instruct on self-defense. He argues that his second taped statement introduced by the state was sufficient to inject the issue in the case. Defendant describes this evidence in his brief as follows:

> He [defendant] said the victim tried to shoot him but he ducked; the next thing he knew he was shooting back and ended up with her gun. A little farther on he said that he saw her gun come up, moved, and heard it go off close to his ear. He pulled his gun and thought he hit her with his first shot in the chest or side. He got her gun, and kept it from her when she tried to get it back. Then she ran, and he fired once in the air and a second time, hitting her hand. She tried to get her gun back again, they fell together, and his gun went off at her head. (transcript citations omitted).

Defendant did not request a self-defense instruction and did not raise this issue in his motion for new trial as required by Rule 29.11. Accordingly, he did not preserve this issue for review and we may only review for plain error. Rule 30.20.

■ To support the claim of self-defense there must be evidence of (1) an absence of aggression or provocation on the part of the defender, (2) a real or apparently real necessity for the defender to kill in order to save himself from an immediate danger of serious bodily injury or death, (3) a reasonable cause for the defender's belief in such necessity, and (4) an attempt by the defender to do all within his power consistent with his personal safety to avoid the danger and the need to take a life. *State v. Fincher*, 655 S.W.2d 54, 58–59 (Mo.App.1983).

> "Self defense grants a defender the privilege to use deadly force in the effort to defend himself against personal harm threatened by the unlawful act of another, if the defender has reasonable cause to believe that (1) there is immediate danger the threatened harm will occur, (2) the harm threatened is death or serious bodily injury and (3) deadly force is necessary to overcome the harm as reasonably perceived."

*Id.* at 59 (quoting from *State v. Ivicsics*, 604 S.W.2d 773, 776 (Mo.App.1980)). If there is substantial evidence of self-defense, the court must instruct the jury on self-defense whether or not defendant requested the instruction. *State v. Ehlers*, 685 S.W.2d 942, 948 (Mo.App.1985); MAI–CR3d 306.06 Notes on Use 2. In determining whether substantial evidence supports a self-defense instruction, we review the evidence in the light most favorable to defendant. *State v. Crews*, 851 S.W.2d 56, 58 (Mo.App.1993).

■ Defendant's statement does not constitute substantial evidence of a real or apparently real necessity for defendant to have killed the victim in order to save himself from immediate danger of serious bodily injury or harm. Defendant first argues he was entitled to use self-defense because he said the victim shot at him first. Assuming the victim did fire a shot at defendant at the outset of the encounter, defendant was not

later privileged to use self-defense to fire the fatal shots when, according to his statement, he possessed both his own firearm and the victim's firearm and the victim had been shot in the chest and in the hand. He was no longer in imminent danger of death or great bodily harm. Defendant's statement does not demonstrate any need to use self-defense. *State v. Turner,* 810 S.W.2d 92, 94 (Mo.App.1991); *State v. Bray,* 818 S.W.2d 291, 293 (Mo.App.1991); *Crews,* 851 S.W.2d at 58.

■ He next argues that, if the victim was shot while she struggled for her gun, self-defense was still available even if there was evidence of accident, citing *State v. Randolph,* 496 S.W.2d 257 (Mo. banc 1973). In *Randolph* the court held the trial court erred in failing to instruct on accident where the defendant's statements contained both elements of self-defense and accident. *Id.* at 262. There the defendant had stated that as he and the victim struggled, he thought the victim was putting his hand into his pocket to draw a weapon so the defendant drew his own firearm and pointed it at the victim's head. The victim then struck the defendant and the gun accidentally went off, killing the victim.

This case is not authority for defendant's argument that self-defense must always be submitted in cases where there is evidence of accident. Because self-defense was submitted to the jury in *Randolph,* whether a self-defense instruction should have been given was not before the court. Further, the self-defense instruction given by the trial court in that case was based on the evidence that defendant had drawn and was pointing his gun at the victim in self-defense when it accidentally discharged. In contrast, in this case defendant's statement does not show he was entitled to use self-defense or was pointing the gun at the victim in self-defense at the time he fell on the victim causing his gun to go off. His statement contains no evidence supporting a conclusion that at that time he was in any immediate danger of great bodily injury or death from the actions of the unarmed and injured victim.

The second taped statement does not provide substantial evidence justifying the use of self-defense in firing the fatal shot. The trial court did not commit manifest injustice in failing to *sua sponte* instruct on self-defense. Point seven is denied.

## II.

### *Exclusion of Psychiatric Testimony*

For his second point, defendant asserts the trial court erred in excluding the proffered testimony of Dr. Manuel Tanay, a psychiatrist, that defendant had a transitory psychotic episode while he was giving his taped statements to police. Defendant argues Dr. Tanay's testimony was relevant and admissible because it went to the voluntariness, weight and credibility of the taped statements.

Prior to trial, the trial court sustained the state's pretrial motion to strike and exclude the expert witness, Dr. Tanay. On June 12, 1992, near the close of defendant's case, defendant made an offer of proof through Dr. Tanay. Dr. Tanay testified that he examined defendant on November 6, 1991 and reviewed defendant's taped statement to police. From this examination and review, he reached an opinion that defendant suffered a transient psychotic episode or dissociative episode while he was in police custody. He said that during the interrogation, defendant entered an altered state of consciousness, or transient induced psychosis. He concluded the significance of defendant's state of mind was:

A. Someone who is in a psychotic state of mind, first of all, is not a reliable informant. I mean, you can't rely upon the information that you gather from someone who purports to be "Death". Makes variety of bizarre statements. Clearly this is in and of itself clearly unreliable.

A person also who is in a psychotic state certainly has no control, no voluntary control over his behavior.

Q. And why is that, Doctor?

A. Because the—that part of the mind which exercises control, which is responsible for reasonable behavior, that part of the mind is out of operation.

That's why we speak of someone being in a psychotic state, their ability to ap-

preciate reality is non-functional or severely disturbed by being in a psychotic state.

Dr. Tanay testified that defendant does not suffer from a personality disorder and he could find no evidence of any psychiatric illness of any kind. He attributed defendant's condition during interrogation to stress resulting from the circumstances of his arrest and interrogation, as related to him by defendant. After the trial court heard Dr. Tanay's testimony, it again sustained the state's motion to exclude the testimony and denied defendant's motion for a mistrial.

■ The admission of expert testimony is within the sound discretion of the trial court. *State v. Ward,* 745 S.W.2d 666, 671 (Mo. banc 1988). We will not disturb a trial court's ruling on the admissibility of expert testimony in the absence of a clear abuse of discretion. *State v. Kennedy,* 842 S.W.2d 937, 941 (Mo.App.1992).

> Generally, expert testimony is admissible if it is clear that the subject of such testimony is one upon which the jurors, for want of experience or knowledge, would otherwise be incapable of drawing a proper conclusion from the facts in evidence. *State v. Taylor,* 663 S.W.2d 235, 239 (Mo. banc 1984). "The theory upon which expert testimony is excepted from the opinion evidence rule is that such testimony serves to inform the court [and jury] about affairs not within the full understanding of the average man." *Farris v. Interstate Circuit,* 116 F.2d 409, 412 (5th Cir.1941). Therefore, proffered expert testimony should be excluded if it does not assist the jury, or if it unnecessarily diverts the jury's attention from the relevant issues. *Taylor,* 663 S.W.2d at 239.

*State v. Lawhorn,* 762 S.W.2d 820, 822–23 (Mo. banc 1988).

■ Defendant first argues that Dr. Tanay's testimony was admissible and relevant to the jury's consideration of the voluntariness of his statement.[1] We disagree.

■ In the first place, no argument was made to the trial court that the testimony should be admitted on the issue of the voluntariness of the confession. Rather Dr. Tanay was offered to explain defendant's conduct and mental state to the jury in psychiatric terms. Further, the inquiry on voluntariness of a statement extends only to determining if a statement was elicited by coercive police tactics. *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). Dr. Tanay testified that defendant's psychotic episode rendered his statements involuntary. A statement which is induced by psychosis or a mental disease which destroys a defendant's volition and makes him confess is not involuntary within the meaning of the due process clause. *Id.*

■ Dr. Tanay's conclusion that the psychotic episode was brought on by the circumstances of defendant's arrest and interrogation was not proper expert testimony on the issue of police coercion. The question of whether police tactics are coercive is a fact question which can be determined by the jurors from their personal experience and on the basis of the evidence in the case without the assistance of a psychiatrist.

■ Defendant next argues that Dr. Tanay's testimony was relevant and admissible on the weight and credibility to be given defendant's taped statement. Generally, expert testimony is not admissible if it relates to the credibility of witnesses because it invades the province of the jury. *State v. Whitmill,* 780 S.W.2d 45, 47 (Mo. banc 1989); *Lawhorn,* 762 S.W.2d at 823.

■ In *Ward,* our Supreme Court held that the trial court did not abuse its discretion in refusing to allow a psychiatrist to testify that a person suffering from the type of mental disorder suffered by the defendant could have confessed to a crime she did not commit in order to end the stress of questioning. 745 S.W.2d at 671. The court found that the diagnosis did not assist the jury in determining whether the mental disorder

---

1. Dr. Tanay's testimony was not offered or argued in support of the motion to suppress or on the issue of admissibility of defendant's taped statements. The trial court had denied the pre-trial motion to suppress on October 4, 1991, and had denied the motion for rehearing of the motion to suppress and had admitted the taped statements before the offer of proof was made.

had any effect on the truthfulness of the defendant's admissions. "[The psychiatrist's] testimony did nothing to aid the jury in finding the facts of the case beyond the normal duty to assess credibility and weigh the evidence." *Id.*

In *Kennedy,* our Southern District affirmed the trial court's exclusion of expert testimony where the defendant asserted that the questions to her psychiatrist and her expected testimony were intended "to explain Wilma's actions and inconsistent statements after the incident" and to explain "the gaps in her memory." 842 S.W.2d at 942. The appellate court read these arguments as an implicit admission that the psychiatrist's testimony was proffered by the defendant to bolster her credibility and was thus inadmissible. *Id.*

The tape recorded statement fully indicates that defendant behaved as though he had two different personalities during the questioning; that at times his "good side" was talking and at other times his "bad side" was talking. Because this condition would be readily apparent to jurors listening to the tape, the jurors did not need an expert witness to explain this to them. The jurors were fully capable of considering the credibility and implications of defendant's behavior during questioning. The trial court did not abuse its discretion in excluding this testimony. Point two is denied.

### III.

#### *Motion to Suppress*

In his third point defendant challenges the trial court's denial of his motion to suppress statements and admission of his statements into evidence. He claims his statements were involuntary and were induced by coercion and promises.

■■■■ A defendant is denied due process if convicted, in whole or in part, upon an involuntary confession. *Jackson v. Denno,* 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908 (1964). The test for voluntariness of a statement is whether, under the totality of the circumstances, the defendant was deprived of the free choice to admit, deny or refuse to answer questions and

whether physical or psychological coercion was of such a degree that defendant's will was overborne. *State v. Lytle,* 715 S.W.2d 910, 915 (Mo. banc 1986). When considering the totality of the circumstances, no single fact is dispositive. *Id.* The fact that defendant voluntarily waived *Miranda* rights is not dispositive of the voluntariness issue, but is an important consideration. *Id.*

■■■■ Once a motion to suppress has been filed, the state bears the burden of going forward with the evidence and the risk of nonpersuasion to show by a preponderance of the evidence that the motion should be overruled. § 542.296.6 RSMo 1986; *State v. Milliorn,* 794 S.W.2d 181, 184 (Mo. banc 1990). We will not reverse the trial court's decision on a motion to suppress unless it is clearly erroneous. *Id.* at 183. We review the factual findings only to determine if they are supported by substantial evidence. *State v. Ritter,* 809 S.W.2d 175, 177 (Mo.App.1991). We defer to the trial court's ability to weigh the credibility of the witnesses. *Milliorn,* 794 S.W.2d at 183–84. We view the facts in the light most favorable to the order challenged on appeal and disregard all contrary evidence and inferences. *State v. Blair,* 691 S.W.2d 259, 260 (Mo. banc 1985).

■■ To determine whether evidence should have been suppressed, we may consider the record made at the pretrial hearing, as well as the record made at trial prior to the introduction of the evidence sought to be suppressed. *State v. Collins,* 816 S.W.2d 257, 258 (Mo.App.1991).

In his point defendant refers to nine specific circumstances which he contends rendered his confession involuntary: 1) that he was arrested in bed by a show of force, 2) that he was detained for eighteen hours and intermittently interrogated by teams of police, 3) that the police refused to honor his previous request for counsel, 4) that the police used his friend Ronald Carter as a psychological ploy, 5) that the police failed to seek medical attention when he collapsed, 6) that the police made an implied promise of help with the prosecutor in exchange for a statement, 7) that the police made an express promise of psychiatric help in exchange for a

statement, 8) that the police refused to fully honor his right to silence and 9) that the police promised a reduction of the charge. We will address each circumstance individually.

### 1. Arrest in Bed

█ Defendant first claims that his confession was involuntary because he was arrested by a team of six officers at 8:00 in the morning while he was in bed. Defendant cites no authority under which these circumstances would render his statement sixteen hours later involuntary. We accordingly decline to address this portion of his point. Rule 30.20.

### 2. Eighteen Hour Detention

█ Defendant next claims that his confession was involuntary because he was detained for eighteen hours and intermittently interrogated by teams of police in a small room. On the length of detention he cites two Missouri cases, State v. Butts, 349 Mo. 213, 159 S.W.2d 790 (1942), and State v. Powell, 266 Mo. 100, 180 S.W. 851 (1915). Butts involved a confession elicited after eighteen hours of interrogation. However, in Butts the court based its finding of involuntariness on numerous egregious coercive circumstances. In that case the defendant was taken back to the scene of the crime three times where 500 hostile onlookers yelled at him, the defendant's family was arrested, handcuffed and shown to defendant, defendant was told his family would not be released until he confessed, and defendant was not permitted to speak to family, friends or counsel but was permitted to overhear police question his wife and hear his wife tell them defendant had not been home. 159 S.W.2d at 792. Further defendant was beaten and his injuries were confirmed by the jail physician. Id. at 791.

Powell is likewise inapposite. In that case nine officers collectively, individually, or in pairs or trios "sweated" the defendant continuously from 2:00 in the afternoon until 1:00 the next morning at which point he was told it would "be best for him to tell the truth" and he made the confession. 180 S.W. at 852.

In this case the record reveals that defendant was only questioned for short periods of time during the eighteen hour period. Specifically, defendant was actually questioned for approximately two and one-half hours in the morning and then given lunch. At 1:00 two detectives talked to defendant for about one-half hour. Defendant was then left alone for the rest of the afternoon until Ronald Carter came in at approximately 4:00. Defendant requested to talk to the civilian police employee, Yarbrough, who talked to him from approximately 6:00 to 7:00 p.m. Defendant then went to another location for five hours where he appeared in a lineup for about one and one-half hours and ate dinner, but was not questioned. After midnight defendant was questioned for approximately two hours.

The length and circumstances of defendant's detention and questioning do not indicate coercion. There were numerous breaks during the day and defendant was given meals and drinks. State v. Feltrop, 803 S.W.2d 1, 13 (Mo. banc 1991). Although the interview room was small, there is no indication that defendant was psychologically or otherwise coerced as a result of being in a small room. See, State v. Hart, 805 S.W.2d 234, 238–39 (Mo.App.1991).

### 3. Absence of Counsel

Defendant contends that because he had an attorney contacted when he was questioned on February 7, 1991, police could not question him again on February 19, 1991 without the presence of counsel. We disagree.

█ The Fifth Amendment prohibition against compelled self-incrimination provides an accused with the right to have counsel present during custodial interrogations. Miranda v. Arizona, 384 U.S. 436, 478–79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). If an accused has asserted a right to counsel and a right to remain silent, police may not reinitiate custodial questioning until counsel has been made available or unless the accused initiates further communications, exchanges or conversations with the police. Edwards v. Arizona, 451 U.S. 477, 484–85,

101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). *Edwards* applies not only to continued questioning in the context of the same investigation but also to questioning in an independent investigation or on other charges. *Arizona v. Roberson,* 486 U.S. 675, 682–85, 108 S.Ct. 2093, 2098–2100, 100 L.Ed.2d 704 (1988). "[W]hen counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." *Minnick v. Mississippi,* 498 U.S. 146, 153, 111 S.Ct. 486, 491, 112 L.Ed.2d 489 (1990).

▮ The *Edwards* rule applies only when the accused actually invokes his right to counsel by "clearly asserting" his right to the assistance of counsel. *Smith v. Illinois,* 469 U.S. 91, 94, 105 S.Ct. 490, 492, 83 L.Ed.2d 488 (1984); *Edwards,* 451 U.S. at 485, 101 S.Ct. at 1885. However, a limited invocation of a right to counsel does not foreclose further police questioning so long as police honor the limitation. *Connecticut v. Barrett,* 479 U.S. 523, 529–30, 107 S.Ct. 828, 832–33, 93 L.Ed.2d 920 (1987); *State v. Hunter,* 840 S.W.2d 850, 870 (Mo. banc 1992). *See also, State v. Reese,* 795 S.W.2d 69, 72 (Mo. banc 1990), *cert. denied,* 498 U.S. 1110, 111 S.Ct. 1025, 112 L.Ed.2d 1106 (1991); *State v. Gill,* 806 S.W.2d 48, 52 (Mo.App. 1991).

▮ In this case, there is no indication that defendant "clearly asserted" his right to counsel before he would speak to police. Rather, the evidence indicates that during the February 7 questioning defendant did not ask for an attorney in relation to an interrogation. When Det. Glenn finished interviewing defendant about the Liscombe homicide, he told defendant that he would be booked on the unrelated outstanding charge for which he had been arrested. Defendant said that his father had told him that his attorney had had that warrant "recalled." When defendant asked to talk to his father or have the police contact an attorney about the outstanding warrant, the police called that attorney.

Defendant's desire to contact an attorney was limited to learning whether his attorney had successfully "recalled" a warrant in an unrelated case. He did not indicate that he wished to consult with an attorney about his discussions with police or that he wished to remain silent until he consulted with an attorney. Because defendant did not assert a right to counsel in the context of police interrogation, his Fifth Amendment right to counsel was not violated.

### 4. Presence of Ronald Carter

▮ Defendant next argues that police used his friend Ronald Carter as a "psychological ploy" and such use was coercive. Defendant relies on *Spano v. People of the State of New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959). In *Spano,* the Court concluded a defendant had been coerced into making a post-indictment confession where the defendant was questioned for eight hours, three times denied counsel, and a lifelong friend was brought in and as instructed by police, made false statements to defendant to elicit defendant's sympathy. 360 U.S. at 318–20, 323, 79 S.Ct. at 1204–5, 1207. After four sessions in which the friend used false statements to importune defendant to confess, the defendant in *Spano* confessed. 360 U.S. at 319, 79 S.Ct. at 1205.

The record in this case reflects that, while defendant was in custody, police also were interrogating Ronald Carter, who had previously turned the murder weapon over to them. Carter requested an opportunity to talk to defendant. The officers felt it would be appropriate and brought him in at 3:30 or 4:00 p.m. Carter told defendant that he (Carter) had turned the weapon over to the police. Carter told defendant that he had seen defendant with the weapon prior to the murder and obtained it from him after the murder. Defendant did not confess to Carter. Rather, defendant suggested to Carter that if he had been smart enough to commit the crime, he would have been smart enough to have thrown the weapon away. Nothing in the record indicates that Carter attempted to make defendant confess or that police instructed him to deliberately elicit statements from defendant.

### 5. Failure to Seek Medical Attention

▮ Defendant next asserts that the police's failure to obtain medical attention for

him when he fainted at the end of his requested conversation with Yarbrough was coercive. Whether defendant actually fainted or faked a collapse was disputed and presented an evidentiary issue for the motion court and the trial court to resolve. *Lytle*, 715 S.W.2d at 915. Further, even if he did faint, all observers noted he recovered immediately, said he was fine, and did not appear to need medical attention. There is no evidentiary basis for his claim that he was coerced by deprivation of necessary medical treatment.

### 6. *Implied Promise of Help with the Prosecutor*

■ Next defendant asserts he was induced to confess by admonitions at midnight that "this is your last chance" and "your little life depends on it" and he needed to tell police what happened otherwise a warrant would be coming down in fifteen to twenty minutes. He argues that these statements were implied promises of leniency, favorable treatment or even immunity which would follow from cooperation.

These statements were not implied promises of leniency which could have extracted a confession.

Missouri courts have held that confessions were voluntary even though preceded by an officer's suggestion that it was in defendant's "best interests" to confess, *State v. Klueg*, 781 S.W.2d 133, 135–136 (Mo.App. 1989); that it would be in his best interests if he told the truth, *State v. Wilson*, 755 S.W.2d 707, 709 (Mo.App.1988); that "it's going to be better in the long run if he would get it out in the open," *State v. Dixon*, 655 S.W.2d 547, 556 (Mo.App.1983).

In *State v. Rickey*, 658 S.W.2d 951, 954 (Mo.App.1983), cases are cited which hold that each of the following is not an impermissible promise: "There are no deals but anything that you do tell us, I am sure will be in your favor;" "if the man is alive, it will help if we can find him"; it would be made known to responsible authorities that he had cooperated; if he were to cooperate, the United States Attorney and Court would be made aware of that fact.

*State v. Clements*, 789 S.W.2d 101, 106–7 (Mo.App.1990). Further, our Supreme Court has held that police statements such as it "looked very bad for [the defendant]," that defendant should "answer only for what he did" and "[i]f it wasn't premeditated murder, you know, then you shouldn't be prosecuted for premeditated murder" did not constitute an implicit or explicit promise of possible leniency or mitigation of punishment. *State v. Schnick*, 819 S.W.2d 330, 336 (Mo. banc 1991). In the same vein the statements referred to by defendant do not fall into the category of implicit promises of possible leniency or mitigation of punishment.

### 7. *Express Promise of Psychiatric Help in Exchange for Statement*

■ Defendant next argues that he was coerced because Det. Ventimiglia offered him psychiatric help if he would give a statement. This claim is refuted by the record. At the pages from the transcript to which defendant cites, Det. Ventimiglia advised defendant, who had claimed that his "bad side" had won, that he could get help and that psychologists have cured personality disorders. Det. Ventimiglia told him if he had a personality disorder he could get help to prevent the "bad side" from returning. He later told him he would get psychological help. Defendant was concerned that he could not be helped and the detective told him that psychiatrists have helped people with up to twenty or thirty personalities.

The transcript reveals solely that the detective told defendant he could and would be helped. However, at no point did the detective condition future psychiatric help on a statement or confession.

### 8. *Refusal to Honor Right to Silence*

■ Defendant next contends that he was coerced in that the police refused to honor his right to silence. He argues that when Det. Ventimiglia asked him to go over his story another time, he responded "Leave me alone please," but the questioning did not end. His claim that he asserted a right to silence which was not honored is refuted by the record.

The request to be left alone occurred during the second tape recorded statement after defendant had told Yarbrough and Det. Ventimiglia that he had shot the victim in the head during a struggle. Det. Ventimiglia told defendant he wanted to go over that story one more time and asked, "Is that okay with you[?]" Defendant responded, "Leave me alone please." Det. Ventimiglia said "For a little while" and asked if they could "come back and talk to you in a little bit?" To which defendant responded "Yeah." Det. Ventimiglia left the room, but Yarbrough stayed and continued to talk with defendant.

In asking to be left alone, defendant did not indicate he wanted to discontinue the questioning altogether. He specifically said the detective could come back and talk to him. Under these circumstances defendant's request to be left alone did not constitute a request to cut off all further questioning and to remain silent. *See, State v. Bailey,* 714 S.W.2d 590, 593 (Mo.App.1986). We note that later on, when Det. Ventimiglia and Yarbrough were talking to defendant, they asked if he was comfortable talking with them or if he would rather talk to someone else. He said he was "fine" with them.

### 9. *Promise of Reduction of Charge*

Defendant last asserts that, after the warrant for first degree murder was issued, police made additional implicit promises when they told him he should tell the truth because, if the shooting was in fact accidental, the warrant would be changed. These statements read in context did not promise a reduction in the charge, but informed defendant that he should tell the truth because, if the shooting had been accidental, the charge would not be first degree murder. This was not a promise of leniency. *Schnick,* 819 S.W.2d at 336.

In sum, the officers acted well within the bounds of constitutional propriety. We have carefully scrutinized all the surrounding circumstances and find that defendant has not shown that his will was overborne or his capacity for self-determination was critically impaired. The trial court's denial of the motions to suppress and rehearing was not clearly erroneous. Point three is denied.

### IV.

### *Admission of Indictment of Another Offense*

For his fourth point defendant contends the trial court erred in overruling in part his motion *in limine* to exclude any evidence of his rape arrest and in overruling his subsequent objections at trial to evidence that defendant had been indicted for rape. He argues the rape indictment was irrelevant, but if relevant, was incompetent evidence of another crime and prejudicially told the jury that the Grand Jury had found sufficient evidence to issue a true bill.

Defendant filed a pretrial motion *in limine* to exclude evidence of his rape arrest. The trial court sustained the motion in part. It allowed the state to read the indictment and the bond memo to the jury but advised the state that it could not go into any further detail about the charges.

At trial, over defendant's objection, the state read into evidence an indictment charging defendant with rape, kidnapping and first degree sexual assault committed on January 31, 1990. The state also read the bond memorandum.

Evidence that a defendant has committed crimes separate and distinct from the crime for which he is charged is generally inadmissible. *State v. Mallett,* 732 S.W.2d 527, 534 (Mo. banc 1987). However, such evidence is admissible to prove the crime charged if it tends to establish motive, intent, absence of mistake or accident, a common scheme or plan, or identity. *Id.* Evidence of other crimes should be admitted under one of these exceptions only when the probative value of the evidence outweighs its prejudicial effect. *Id.* The balancing of prejudicial effect and probative value lies within the sound discretion of the trial court. *Id.* Generally, wide latitude is allowed in the development of evidence of motive. *Id.* at 535.

The evidence of the pending indictment and the conditions of defendant's release was admissible and relevant to show defendant's motive for the killing. "Evidence of other crimes has frequently been

admitted to show motive, despite any incidental prejudice to defendant." *Id.* In *Mallett,* in which the defendant was convicted of murdering a state highway patrolman, our Supreme Court held the trial court did not abuse its discretion in admitting detailed evidence of the crime of robbery for which that defendant was charged but not convicted at the time of the patrolman's murder. It held the evidence was necessary to establish that the defendant knew he was wanted for robbery and, if caught, would most likely be returned to Texas to face the new charges and probation violations. It held that this knowledge was relevant proof of motive because it tended to refute the defendant's claim that the shots were fired accidently. *Id.* at 534–36.

Defendant's knowledge that a serious indictment was pending against him along with the facts that he was on bond and would face incarceration if a police officer found him violating his bond conditions was relevant to his motive for killing the officer rather than be apprehended or identified. The evidence was probative on the issue of defendant's state of mind at the time of the offense and rebuts his taped statement in which he claimed the fatal shot was accidental.

▉▉▉ Defendant argues, however, that the state could have shown the underlying crime through the bond memorandum alone. He asserts that the reading of the indictment was prejudicial because the indictment contained the phrases "The Grand Jurors of the County of St. Louis, State of Missouri, charge:" and "True Bill signed by the foreman of the Grand Jury." He argues that the jurors would be misled by this language into believing that the indictment represented proof of the crimes charged therein. We disagree. The language itself does not reasonably indicate proof of the crimes. Further, at the end of the case, the jury was instructed, "The charge of any offense is not evidence, and it creates no inference that any offense was committed or that the defendant is guilty of an offense." We presume that each juror properly followed the court's instructions. *State v. Preston,* 673 S.W.2d 1, 7 (Mo. banc 1984).

The trial court did not abuse its discretion by allowing the indictment to be read into evidence. Point four is denied.

## V.

### *Exclusion of Third Party's Inculpatory Statement*

For his fifth point defendant asserts that the trial court erred in excluding a third party's statement that he had killed "that lady police officer." He contends his due process rights were violated because this was a reliable statement against penal interest which exonerated him and was corroborated by a witness who identified the victim's weapon in the third party's possession.

After the jury was selected and before evidence was adduced, defendant's attorney advised the court that a witness, Maine Woods was avoiding service and was unavailable. Defense counsel made an offer of proof that two witnesses, Michael Wayne Hall and Charles Peoples, heard Maine Woods make a statement that he had killed "that lady police officer" and that one of the witnesses later saw Maine Woods exhibit a firearm similar to the victim's.

Hall testified first for the defense on the offer of proof. At the time of the hearing, Hall was incarcerated in St. Louis County for the offense of second degree robbery. According to Hall, in middle to late January, 1991, he and others, including Maine Woods, Peoples, Leevester Wiggley and Bobby Woods were searching for cocaine that Leevester Wiggley said he had thrown into a creek when stopped by police. Hall testified that Maine Woods became angry because he thought Wiggley had lied about throwing the cocaine into the creek. Maine Woods threatened to hurt everybody. Hall testified that when they got back in the car, Maine Woods told Wiggley, "I'm going to kill." "Motherfucker, I know you got that dope, I kill you just like I killed that police lady." Maine Woods asked Bobby Woods to give him a gun, but Bobby Woods did not.

Hall said a few days later Maine Woods pulled a car up to him and some others, pointed the gun at Wiggley, said he wanted his money, and then left. Defense counsel

showed Hall an unidentified picture of a gun. Hall stated that the gun Maine Woods had was similar but shorter than the one pictured, was a chrome pistol with a four inch barrel, a little bigger than a .38. Hall testified he did not know Maine Woods prior to the creek incident.

Peoples also testified in support of the offer of proof. At the time of the hearing, Peoples was serving a sentence for second degree assault. Peoples testified that in April or May, 1991 he was in the creek looking for cocaine with Maine Woods, Bobby Woods, Hall, Wiggley and others. After the group left in a car, Peoples said Maine Woods became angry at Wiggley because he did not believe Wiggley had really thrown the cocaine in the creek and owed Maine Woods' nephew, Bobby Woods, for it. Maine Woods then asked Bobby Woods for a pistol, so he could shoot Wiggley. Peoples testified Maine Woods said, "I kill him just like I killed that lady police officer." Peoples never saw a gun. They eventually dropped Maine Woods off at a lounge. Peoples said he was not a friend of Maine Woods and did not associate with him. He did not testify to any further incident concerning Maine Woods.

On the basis of the testimony of the private investigator who had been unsuccessfully trying to serve Maine Woods, the court found Maine Woods to be unavailable. The trial court further found that Maine Woods' statement was incriminatory, but that the remaining indicia of reliability were not met because Hall and Peoples were not close friends or acquaintances of Maine Woods and there was no corroborating evidence. The court found Hall's testimony that he saw Maine Woods with a nickel plated gun was insufficient corroboration of his statement that he killed the victim without any testimony or evidence that the weapon he displayed was the one taken from the victim.

In criminal proceedings an unavailable witness's declarations against penal interest are ordinarily not admissible as an exception to the hearsay rule. *State v. Blankenship*, 830 S.W.2d 1, 6–7 (Mo. banc 1992). The sole exception to this rule are those statements which, if admitted and believed, would have exonerated the defendant and "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." *Chambers v. Mississippi*, 410 U.S. 284, 300, 93 S.Ct. 1038, 1048, 35 L.Ed.2d 297 (1973); *Blankenship*, 830 S.W.2d at 7.

The indications of reliability identified in *Chambers* are (1) each confession was "in a very real sense self-incriminatory and unquestionably against interest," (2) each statement was spontaneously made to a close acquaintance shortly after the murder occurred, and (3) the statements were corroborated by other evidence in the case. 410 U.S. at 300–1, 93 S.Ct. at 1048; *Blankenship*, 830 S.W.2d at 7.

Defendant argues that the trial court erred in applying the second indicia of reliability to the evidence adduced at the hearing. He asserts that the focus should be on the "spontaneity" of the admission and not on whether it was made to "close friends." Hall's recognition of a gun "just like the victim's" in Maine Wood's possession corroborated the statement. We disagree.

*Chambers* involved the shooting of a police officer who was trying to execute an arrest warrant before a hostile crowd of 50–60 persons. Both the defendant, Chambers, and the declarant, McDonald, were in the crowd. Chambers was shot by return fire and McDonald, Turner and a third man took Chambers to the hospital. Chambers was subsequently charged with the officer's murder.

At trial Chambers sought to introduce the testimony of three witnesses that McDonald spontaneously and separately confessed to each of them shortly after the murder occurred. The first witness, Hardin, a lifelong friend of McDonald's, testified that he had spent the evening with McDonald after McDonald returned from the hospital on the night of the shooting and that, while driving him home later that night, McDonald told him that he had shot the officer. The second witness, Turner, a cousin and friend, testified that while he and McDonald were taking Chambers to the hospital, McDonald said he had shot the officer. A week later McDonald

reminded Turner of this conversation and asked Turner not to "mess him up."

The third witness was McDonald's neighbor and friend for 25 years. He testified that, on the morning after the shooting, McDonald told him he had shot the officer with a .22 caliber revolver which he had disposed of later that night. A few weeks later, the witness accompanied McDonald to another town where he purchased a replacement .22 pistol. All of this testimony was excluded.

However, evidence was admitted in *Chambers* that McDonald had made a written sworn confession to Chamber's attorneys which he later repudiated, and that he owned a .22 pistol at the time of the crime and purchased another .22 pistol after the crime. Hardin testified that he saw McDonald shoot the officer. Another witness, a cousin of the victim, testified he saw a weapon in McDonald's hand immediately after the shooting.

Based on the above evidence and offers of proof the Supreme Court held:

The hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability. First, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by some other evidence in the case—McDonald's sworn confession, the testimony of an eyewitness to the shooting, the testimony that McDonald was seen with a gun immediately after the shooting, and proof of his prior ownership of a .22–caliber revolver and subsequent purchase of a new weapon. The sheer number of independent confessions provided additional corroboration for each. Third, whatever may be the parameters of the penal-interest rationale, each confession here was in a very real sense self-incriminatory and unquestionably against interest. See *United States v. Harris*, 403 U.S. 573, 584, 91 S.Ct. 2075, 2082, 29 L.Ed.2d 723 (1971); *Dutton v. Evans*, 400 U.S. [74], at 89, 91 S.Ct. [210], at 219 [27 L.Ed.2d 213 (1970) ]. McDonald stood to benefit nothing by disclosing his role in the shooting to any of his three friends and he must have been aware of the possibility that disclosure would lead to criminal prosecution. Indeed, after telling Turner of his involvement, he subsequently urged Turner not to "mess him up." [footnote omitted].

410 U.S. at 300–1, 93 S.Ct. at 1048–49.

In this context it is clear that the court was not emphasizing the spontaneity of the statement over the fact that it was made to close friends. Rather the significance of the fact that the admissions were made to close friends emphasized the fact that each admission was made as a confidence in the context of a friendship and thus reliable on that basis. In contrast, in this case, defendant was not making an admission in confidence to his friends, but was trying to intimidate and threaten someone he thought may have cheated his nephew in a drug transaction. His reference to having killed a "lady police officer" was used to bolster his threat to someone he thought may have cheated his nephew in a drug transaction. Under these circumstances it was not reliable as a truthful admission.

Further there was no corroborating evidence as in *Chambers*. The fact that one witness saw Woods with a shiny weapon with a four inch barrel like the one in a photograph establishes nothing. Although there was evidence at trial that the victim's weapon was a buffed Smith & Wesson 686 with a four inch barrel, this was not a fact unique to Officer Liscombe's firearm. This is too insubstantial a link to the victim's weapon to corroborate Maine Woods' statement and to assure its reliability.

Further, we note that, unlike the statements in *Chambers,* the statement sought to be admitted was made only once, not on multiple occasions, *Blankenship,* 830 S.W.2d at 8, and never as a sworn written statement. Further, unlike *Chambers*, there was no evidence placing Maine Woods at the scene of the crime, *Blankenship,* 830 S.W.2d at 8, or identifying him as the perpetrator. In sum, there was none of the substantial corroborating evidence present in this case as there was in *Chambers*.

The trial court did not err in excluding Maine Woods' statement. Point five is denied.

## VI.

### *Failure to Exclude Testimony of Hypnotized Witnesses*

Defendant next asserts that the trial court erred in overruling his motion to exclude the testimony of hypnotized witnesses Steve Carter and Charles Myers. He argues that their recollections were impermissibly influenced and that inadequate safeguards were taken at the hypnotic sessions. We find this point was not preserved for review and does not constitute plain error.

Steve Carter and Charles Myers both gave police statements describing a man they had seen with the victim at the intersection where she was fatally wounded. After these witnesses gave their statements and participated in a photo reenactment, they were hypnotized. Prior to trial defendant moved to suppress their out-of-court and in-court identification testimony as well as all pre-hypnotic and post-hypnotic testimony. After a hearing, the motion court partially granted the motions. It suppressed Carter's and Myers' post-hypnotic testimony and their identification of defendant. However, it overruled the motion with respect to these witnesses' pre-hypnotic testimony. We upheld the partial grant of the motion. *State v. Blackman*, 826 S.W.2d 76, 79 (Mo.App.1992).

Subsequent to our decision defendant refiled his motion to exclude any testimony of the hypnotized witnesses. Prior to voir dire, the trial court ruled that only the testimony given after hypnosis would be excluded. When Myers was called to testify, defendant did not object to his testimony which tracked his pre-hypnosis statement. Defendant did object when Myers testified that the person was "heavy" and weighed between 200 and 220 pounds. Defense counsel stated, "I'm objecting to the scope of this interrogation, seems to be going a little outside of the pre-hypnosis and it makes it difficult for me now to cross-examine." He pointed out that Myers had not used the word "heavy" and had put the suspect's weight at 200 pounds.

After a bench conference discussing possible courses of action, defense counsel agreed to the state's offer to rehabilitate Myers on the weight issue and suggested the state lead this witness through the description in the police report. The state then led Myers through his pre-hypnotic description to police. Defendant did not object to Carter's testimony.

A trial court's ruling on a motion *in limine* is interlocutory and thus not appealable. *State v. Buchanan*, 824 S.W.2d 476, 478 (Mo.App.1992). To preserve the issue for appeal, defendant was required to object on the appropriate ground at the time the evidence was offered. *Id.* Since defendant did not object to the testimony based on the pre-hypnotic description during trial, he did not preserve this question for review. *State v. Barteau*, 687 S.W.2d 573, 576 (Mo. App.1985). Further, the trial court did not plainly err in admitting this testimony. Because the witnesses' testimony was strictly limited to their pre-hypnotic statements, the testimony could not have been tainted by the hypnosis. *Id.* at 576–77. Point six is denied.

The judgment of the trial court is affirmed.

KAROHL and CRAHAN, JJ., concur.